In re CARDINAL INDUSTRIES, INC., Jointly Administered with Cardinal Industries of Florida, Inc., Cardinal Partner Corporation, Cardinal Partnership Corporation, Cardinal Industries of Georgia, Inc., Cardinal Industries Services Corporation, Cardinal Industries Mortgage Company, Cardinal Parts Service Co., Cardinal Lodging Group, Inc., Cardinal Apartment Management Group, Inc., Cardinal Industries Development Corp., Cardinal Industries of Florida Services Corp., Cardinal Industries of Georgia Services Corp., Debtors.

Bankruptcy Nos. 2–89–02779, 2–89–02778, 2–89–07291, 2–89–07292, 2–90–01323, 2–90–02087, 2–90–02107, 2–90–02675, 2–90–02747, 2–90–02940, 2–90–03091, 2–90–03244 and 2–90–03245.

United States Bankruptcy Court, S.D. Ohio, E.D.

May 14, 1990.

See also, Bkrtcy., 113 B.R. 378.

Daniel R. Swetnam, Mark E. McGrady, Joanne F. Weber, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for movants.

Jay Alix, Southfield, Mich., Chapter 11 Trustee.

Michael L. Cook, Sally M. Henry, Skadden, Arps, Slate, Meagher & Flom, New York City, Gen. Counsel, Marilyn Shea–Stonum, Jones, Day, Reavis & Pogue, Columbus, Ohio, Sp. Counsel, to trustee.

Charles M. Caldwell, Asst. U.S. Trustee, Columbus, Ohio, Columbus Office of the U.S. Trustee for Region IX.

Lori Lapin Jones, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, and Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, for the Official Committee of Unsecured Creditors of Cardinal Industries, Inc.

P. Steven Kratsch, Kilpatrick & Cody, Atlanta, Ga., for the Official Committee of Unsecured Creditors of Cardinal Industries of Florida, Inc.

Harvey S. Minton, Minton & Leslie, Columbus, Ohio, Counsel for Cardinal Industries of Georgia, Inc., Cardinal Industries Mortg. Co. and Cardinal Parts Service Co.

Charles J. Taunt, Birmingham, Mich., for Cardinal Industries Services Corporation, Cardinal Industries of Florida Services Corp. and Cardinal Industries of Georgia Services Corp.

Thomas R. Noland, Altick & Corwin, Dayton, Ohio, for Cardinal Partnership Corp. and Cardinal Partner Corp.

Gary H. Cunningham, Schlussel, Lifton, Simon, Rands, Galvin & Jackier, Southfield, Mich., for Cardinal Lodging Group, Inc., and Cardinal Apartment Management Group, Inc.

## OPINION AND ORDER ON MOTION OF GIFFIN MANAGEMENT GROUP, INC., ET AL., AGAINST CARDINAL INDUSTRIES, INC. FOR RELIEF FROM THE AUTOMATIC STAY

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court upon the motion filed by Giffin Management Group, Inc. ("Giffin") and numerous named individuals and other entities (collectively the "Movants") seeking relief from the automatic stay imposed by 11 U.S.C. § 362(a). The Movants are limited partners or representatives of limited partners in three separate limited partnerships: Willowood Apartments of Macombe County, Ltd. ("Willowood I"); Willowood Apartments of Macombe County II, Ltd. ("Willowood II"); and Princeton Court Apartments of Wayne County, Ltd. ("Princeton Court") (collectively the "Partnerships"). The Movants seek relief from the automatic stay in order to remove Cardinal Industries, Inc. ("Debtor") as the managing general partner of each of the Partnerships and to proceed with the selection of Giffin as the new managing general partner.

The parties agreed to waive the preliminary hearing and a final hearing was scheduled for March 20, 1990. The Debtor filed a memorandum opposing the relief sought on March 16, 1990; and the Movants subsequently filed a hearing memorandum on March 19, 1990. The motion

was heard March 20, 1990 and the record of that hearing remained open for certain post-hearing matters, including the deposition of Richard Brock and additional stipulations by the parties. The Trustee for the Debtor filed a post-hearing memorandum with the Court on April 4, 1990; and the Movants submitted a reply memorandum on April 12, 1990. On April 13, 1990 the Court heard oral arguments by the Movants, Jay Alix as the Operating Trustee for the Debtor ("Trustee") and the Official Committee of Unsecured Creditors of Cardinal Industries, Inc. ("Committee"). The Court then took the matter under advisement. Pursuant to B.2.(e) of the Case Management Order issued in this case, as amended, the stay has been continued in effect until the issues raised by the parties could be decided by the Court. Further, the agreed scheduling and hearing procedures in this matter evidence waiver by the parties of the time limitations set forth in 11 U.S.C. § 362.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(G). The following constitute findings of fact and conclusions of law.

### FINDINGS OF FACT

An extensive history of the Debtor's business operations and of previous events in this case has been set forth in earlier opinions of this Court. *See Cardinal Industries, Inc. v. Buckeye Federal Savings & Loan Assoc. (In re Cardinal Industries, Inc.),* 102 B.R. 991; 105 B.R. 834 (Bankr.S. D.Ohio 1989) ("Buckeye Adversary"); *In re Cardinal Industries, Inc.,* 109 B.R. 755 (Bankr.S.D.Ohio 1990) ("Trustee Hearing"). Therefore, only those aspects of the Debtor's operations relevant to this matter are set out herein.

#### A. *General Background*

Debtor Cardinal Industries, Inc. is the parent corporation atop a vertically integrated organization of wholly-owned subsidiaries which plans, builds, manages and supplies services and products to real estate projects. To date, the Debtor has developed over 1,200 such real estate projects in twenty states. The majority of those projects involve apartments, motels or retirement villages.

Presently, the Debtor is involved in approximately 900 real estate projects. Each project is owned by a limited partnership which operates a discrete property or a single phase of a multi-phase property. In each of these partnerships, the Debtor or a subsidiary serves as the managing general partner. The morning of the day the Debtor filed for bankruptcy protection, the Debtor caused an additional general partner to be added to each of the partnerships. For virtually all of those partnerships, including the three limited partnerships at issue here, the entity asserted to be the additional general partner is R/E Management, Inc., a corporation owned entirely by Austin Guirlinger, the primary shareholder of the Debtor.

Approximately half of the 900 limited partnerships are syndicated. In these syndicated partnerships, outside third party investors have purchased the limited partnership units. The number of outside investors is nearly 10,000 and their total investment is estimated at $425,000,000.00. The addition of R/E Management in the partnerships has not been approved by the Movants.

#### B. *Prepetition Cash Management*

Prior to filing for Chapter 11 protection, the Debtor maintained a complex cash management system designed to track funds throughout its entire organization. Funds from different segments of the organization were routinely used to support other operations of the organization. On occasion, funds from cash-rich partnerships were used to support underperforming or immature properties of other partnerships. These intercompany transfers were reflected in the cash management system as advances and reimbursements. The complexity of the system proved susceptible to

simple human errors which have had serious and severe ramifications.

Beginning in the early 1980s the Debtor further established a system of concentration accounts into which funds of various related entities were deposited pending disbursements to lenders, trade vendors or investors. One such account was set up at the Huntington National Bank ("the Huntington Account") for all of the apartment properties. The funds in that account were identified internally by partnership, but the Huntington Account bore the Debtor's federal employer identification number.

On April 19, 1989, the Huntington set off $9,200,000.00 held in the Debtor's disbursement accounts. That setoff was for obligations of the Debtor. A portion of those funds belonged to partnerships operating apartment complexes. The evidence showed that the amounts attributable to the partnerships at issue here were $95.53 for Willowood I; $72.81 for Willowood II; and $292.51 for Princeton Court. The evidence further showed that such funds have not been returned by the Huntington.

More significant to these Partnerships than the Huntington sweep was the inadvertent transfer of roughly one million dollars from various partnerships that occurred on or about May 15, 1989. Those transfers occurred following a review by the Debtor of partnerships with available cash which owed money to the Debtor. This review, however, completed on the eve of the Debtor's bankruptcy filing, resulted in the wrong partnerships being assessed. As a result of this assessment, $72,742.00 was transferred from Willowood I and $15,540.17 from Willowood II. The parties stipulated that these funds were never returned to Willowood I or Willowood II.

After the filing of its Chapter 11 petition, the Debtor changed its use of concentration accounts. Instead a separate, segregated account has been opened for each of the partnerships. Funds from those accounts are transferred to a central disbursement account only for the purpose of paying a particular partnership's bills. The disbursement account is designated as a trust account which purportedly is not subject to set off. Further, pursuant to orders from this Court or requirements of the United States Trustee, the Debtor's cash management system has been restricted to prevent the type of diversions of cash that occurred prepetition.

## C. *Post Petition Transfers*

The Movants contend that despite the changes in the Debtor's cash management system, diversions of partnership funds have continued to occur, at least with respect to Willowood II and Princeton Court. Funds were transferred from Willowood II to the Debtor (or an affiliate of the Debtor) as reflected on the balance sheets for June 30, 1989, July 31, 1989, September 30, 1989, and October 31, 1989. The amounts of these transfers were $18,000.00, $48,000.00, $1,150.00 and $2,300.00 respectively. Similar transfers were made from Princeton Court at or near the same times in the amounts of $26,410.00, $15,290.00, $8,340.00, $36,140.00 and $8,340.00. In each instance, the apparent source of this cash was investor subscription payments. In several cases, these investor notes had been pledged as collateral to a lender. In addition to these transfers, an accounting entry on the December 31, 1989 balance sheet for Princeton Court lists a non-cash transaction of $27,200.00 indicating a liability of that partnership to the Debtor. The single most important postpetition transfer, relied on by the Movants, was a payment of $59,215.74 on or about November 21, 1989 from Princeton Court to Cardinal Industries Service Corporation ("CISC"), a wholly-owned subsidiary of the Debtor, out of Princeton Court's operating funds.

The Debtor denies any wrongdoing in regard to these transfers. It claims that the investor subscription payments were used only to pay legitimate obligations of Willowood II and Princeton Court owing to the Debtor (or an affiliate of the Debtor) in the ordinary course of business or as debt service. These obligations included partnership administration fees, second mortgage interest, and interest and principal on the deferred purchase price. The $59,215.74 was asserted to be a repayment of

an advance made in 1987 by the Debtor to the limited partners in order to offset the effect of the Tax Reform Act of 1986.

## D. *Relationship of Movants to the Limited Partnerships*

All three of the Partnerships involved in this matter are syndicated limited partnerships, each of which owns and operates an apartment complex. The Movants in this action are limited partners or representatives of limited partners of those Partnerships. The individuals owning the entities which initiated this action are employed as financial planners and investment counselors and were the securities dealers responsible for selling most, if not all, of the limited partnership units in these Partnerships.

Relief from the automatic stay is sought by the Movants so that they may remove the Debtor as the managing general partner of the Partnerships in a manner which is in accordance with the requirements of their respective Partnership Agreements. At the time of the hearing, the Movants had submitted ballots to all limited partners on the issue of whether or not to remove the Debtor. The Movants testified that each of them presently hold a sufficient number of returned ballots to remove the Debtor as the managing general partner of their respective partnership.

Prior to receipt of all of the ballots, but after receiving verbal commitments from each of the limited partners, Giffin notified the resident managers of Princeton Court and at Willowood I and II that Giffin had been elected as general managing partner of the Partnerships. Giffin met with the resident managers of Princeton Court and offered to continue their employment if they resigned from Cardinal Apartment Management Group ("CAMG"), a wholly-owned subsidiary of the Debtor. Giffin set up a bank account for Princeton Court and instructed the resident managers to deposit any rent checks they received into that account.

Giffin did not meet with the resident managers at Willowood I and II, but instead sent them a letter telling them they were fired. Giffin subsequently entered the locked offices of Willowood I and II while the resident managers were away over the Christmas weekend; changed the locks; took the files, keys and rent checks; and boarded the door between the office and the resident managers' apartment. Giffin remained in possession of Willowood I and Willowood II until this Court issued a temporary restraining order a few days later. During this time, Giffin collected nearly $10,000.00 in rent checks which it subsequently turned over to the chief financial officer for CAMG.

## E. *The Properties*
### 1. Willowood I and Willowood II

Willowood I and Willowood II are Ohio limited partnerships formed to operate two phases of an apartment complex located in Macombe County, Michigan. Willowood I began operations in 1983 and was syndicated in early 1984. Willowood II began operations in 1984 and was syndicated that same year. A third phase, Willowood III, began operating in 1987, but was sold to a group of private investors in May, 1989, just prior to the Debtor's bankruptcy filing. Willowood I and Willowood II are managed by CAMG.

Willowood I and Willowood II started to experience serious financial difficulties in early 1989. These difficulties were exacerbated by the Huntington sweep which occurred in April, 1989. Although the amounts belonging to these Partnerships that were setoff by Huntington were relatively small compared with other partnerships, the sweep itself resulted in much confusion and, for a time, a lack of bank accounts from which to pay obligations for services to these Partnerships and their apartment complexes. This confusion was compounded by the Debtor's Chapter 11 filing in May, 1989, and the subsequent relocation of the Debtor's computer system and remote accounting offices.

These financial difficulties had a substantial effect on the operations of Willowood I and Willowood II, most of which occurred prepetition. An award-winning flower program was discontinued, advertising

stopped, and many vendors went unpaid. Payroll checks were delayed and some even were returned for insufficient funds. In many cases those vendors who were not paid, including lawn maintenance companies, exterminators and carpet cleaners, cut off services. Electric service was also cut off to the laundry rooms and vacant apartments on two occasions, one of which occurred postpetition. Willowood II also experienced a severe problem with its hot water heaters. Because money became unavailable to purchase replacements, hot water heaters were taken from vacant apartments, leaving them unrentable. Most shocking to the Movants, however, was the cut-off of supplies by Cardinal Parts Service Company ("CPSC"), a wholly-owned subsidiary of the Debtor. CPSC provided refrigerator parts, draperies and nearly everything needed to maintain the inside of the apartments.

Most of these problems were resolved by October, 1989,. and all were corrected by the date of the hearing. Both Willowood I and Willowood II are current on their mortgages and accounts payable, and each has money to pay its real estate taxes. Willowood I is presently performing about $3,500.00 below budget on an annual basis and Willowood II is within $376.00 of budget.

### 2. Princeton Court

Princeton Court is an Ohio limited partnership formed in 1983 and syndicated in 1985. It operates an apartment complex in Wayne County, Michigan. Princeton Court experienced the same financial difficulties in early 1989 as Willowood I and II for the same reasons. There was little testimony, however, concerning the effect of these financial difficulties on the operation of the apartments except for generalized complaints that the fences and trim needed painting, that some apartments were unrentable due to damage and that advertising had ceased.

The problems at Princeton Court were also resolved prior to the hearing. Princeton Court is now current on both its mortgage and accounts payable, and has money to pay its real estate taxes. It is perform-ing over budget by approximately $3,500.00.

### 3. Importance of the Properties to the Estate

The testimony indicated that these three properties together will produce management fees of $69,000.00 for CAMG in 1990. The testimony further indicated that the value of these Partnerships and the other syndicated partnerships to the Debtor's estate lies in the second mortgages, loans and advances payable to the Debtor or one of its subsidiaries. Because these values cannot be realized for seven to ten years, it is important to the Debtor's estate that these Partnerships not be sold during this time period and that the Debtor continue to control selection of the operating entity.

## ISSUES PRESENTED

There are two issues before the Court for determination:

1. Were the Debtor's management interests as general partner terminated by the bankruptcy filing pursuant to 11 U.S.C. § 365(e)(2)(A), thus freeing the Movants to remove the Debtor because the automatic stay would be lifted as a matter of law; or

2. If the Movants are not free from bankruptcy law restraints, does "cause" exist to grant the Movants relief from the automatic stay under 11 U.S.C. § 362(d)(1) so they may remove the Debtor as the general partner of the Partnerships in accordance with their respective Partnership Agreements.

## DISCUSSION

This Court has held that certain of the Debtor's interests as a general partner of the limited partnerships are property of the Debtor's bankruptcy estate. *Cardinal Industries*, 105 B.R. at 848–49. *See also Quarles House Apts. v. Plunkett (In re Plunkett)*, 23 B.R. 392 (Bankr.E.D.Wis. 1982); *In re Unit, Inc.*, 45 B.R. 425, 427 (Bankr.S.D.Ohio 1984) (inferring that removal of debtor general partners would violate the automatic stay). Those general partner interests are comprised of three components: the right to participate in

profits, losses, distributions and proceeds of the partnership ("Economic Interest"); the right to participate in the management of the partnership ("Management Interest"); and the ownership share in partnership property as a tenant-in-partnership. Both the Economic Interest and the Management Interest are protected by the automatic stay imposed in the general partner's Chapter 11 case from actions attacking those interests directly. *Cardinal Industries*, 105 B.R. at 849–50.

The Movants initially contend that it is not even necessary for them to seek relief from the automatic stay in order to terminate the Debtor's Management Interest. They argue that certain *ipso facto* clauses within the Partnership Agreements and provisions of the Revised Uniform Limited Partnership Act ("RULPA") give them the unequivocal right pursuant to 11 U.S.C. § 365(e)(2)(A) to remove the Debtor as general partner, and that the exercise of that right is not subject to the automatic stay. For this proposition, they principally rely on *Watts v. Pennsylvania Housing Finance Co.*, 876 F.2d 1090 (3rd Cir.1989). *Watts* held that the right of a lender under § 365(e)(2)(B) to terminate an executory contract to make a loan was not stayed under § 362. The Trustee claims that the automatic stay is applicable in such cases even if the given contract is not assumable and the right to terminate under § 365(e)(2) exists. The Trustee's position is supported by *Computer Communications, Inc. v. Codex Corporation (In re Computer Communications, Inc.)*, 824 F.2d 725 (9th Cir.1987) and *In re Wegner Farms Co.*, 49 B.R. 440 (Bankr.N.D.Iowa 1985).

The question in this case is an academic one, since the Movants have requested relief from the automatic stay, as well as termination under § 365(e)(2). Prior to the filing of their motion, however, the Movants engaged in the type of self-help remedy consistent with their interpretation of the interplay between § 365(e)(2) and § 362. Thus, the question is one which is appropriately addressed here.

■ The Court believes that given its prior decision in the Buckeye Adversary, *Cardinal Industries*, 105 B.R. at 848–50, any party who knowingly takes action against the Debtor's general partnership interests without seeking relief from stay does so at its own risk. Even the decision upon which the Movants primarily rely advises that "the nondebtor party acting unilaterally may want to make a motion for relief from the automatic stay in a doubtful case in order to avoid liability for *ex parte* action which is later determined to be unlawful." *Watts*, 876 F.2d at 1096 n. 11. If the Movants are successful in establishing the continued enforceability of the *ipso facto* clauses, relief from the automatic stay will be granted as a matter of course. But nondebtor parties, such as the Movants, should seek and await such a determination by the Court before acting upon beliefs that an executory contract cannot be assumed or assigned on behalf of the estate.

In addition, it is important that all parties impacted by a bankruptcy filing recognize that reorganization in bankruptcy is a collective process. If a few rush to grab what only arguably is theirs and others follow suit, those who have more carefully observed the law or have given the legal remedy an opportunity to work are hurt. And the collective nature of the remedy is destroyed. That approach is antithetical to the legal process. Even though parties may not want to be involuntarily involved in a bankruptcy proceeding, that fact does not affect the Court's duty to insure that the bankruptcy laws are properly interpreted and implemented.

I. Termination of the Debtor's Management Interest Under 11 U.S.C. § 365(e)(2)(A)

In an earlier opinion, this Court noted that various parties have asserted that the Chapter 11 filing of this Debtor terminated its Management Interest as general partner under state statutory law and the terms of the Partnership Agreements. *Cardinal Industries*, 105 B.R. at 849. While cognizant of the issue's importance, the Court considered the issue tangential to the matters at issue in that adversary and concluded, admittedly without extensive

written analysis, that the Supremacy Clause of Article VI of the Constitution of the United States and the provisions of 11 U.S.C. § 365(e) defeated such arguments. *Id.* at 849. The Movants now argue that § 365(e)(2)(A) "validates" the *ipso facto* provisions of the Partnership Agreements and the Revised Uniform Limited Partnership Act ("RULPA"), and therefore, the Supremacy Clause is not invoked because there is no conflict between state partnership law and the federal bankruptcy code. Finding nothing in the Court's previous opinion indicating an analysis of § 365(e)(2)(A) with regard to the *ipso facto* clauses, nor any discussion of that section in the cases cited in support of the Court's conclusion, the Movants request that the Court reconsider its previous finding.

Given the importance of this issue to these jointly administered cases generally, and the fact that it is squarely before this Court for the first time, the Court has agreed to reconsider its earlier conclusion. The Court acknowledges with great appreciation that in reconsidering the issue it has been afforded the luxury of exhaustive briefing and excellent oral argument by the parties.

The Movants base much of their argument upon the provisions in 11 U.S.C. § 365(e)(2)(A) which permit *ipso facto* termination clauses to be effective despite the invalidation provisions of § 365(e)(1) if applicable law excuses the nondebtor party to the contract from accepting performance from a trustee or an assignee of the Debtor's interest. In each of these partnerships, the Movants argue that assignment of the general partner's management rights to a third party without the consent of the limited partners is prohibited by either the Partnership Agreement or applicable state partnership law. It is the Movants' thesis that such prohibitions cause the clauses in those agreements providing for automatic termination of the Debtor as general partner upon the filing of a bankruptcy case to be given effect. This result stems from the Movants' contention that the Chapter 11 trustee now in charge of the Debtor's operations, and even the debtor in possession prior to the trustee's ap-

pointment, are different and distinct legal entities from the entity with whom the limited partners originally contracted and are entities from whom the limited partners do not have to accept performance. Further, the Movants insist that the general partner management rights are generally unassignable under the Partnership Agreements or under applicable state law.

Expectedly, the Trustee concurs in the Court's earlier finding and rejects the argument posited by the Movants. The Trustee contends the plain language of § 365 is unclear and stresses the importance of determining the true intent of Congress in enacting the section. Based upon the legislative intent and the objective of Chapter 11 the Trustee contends that the test advocated by the Movants is incorrect. Further, the Trustee argues that the new entity theory has been seriously questioned or, in the alternative, is not relevant in the context of a Chapter 11 proceeding in which an operating trustee has been appointed for a corporate debtor.

It is important to note that dissolution of the partnership is not the subject of this opinion. Both parties agree that the Partnerships were not dissolved upon the filing of the general partner's voluntary petition for relief. *See Cardinal Industries,* 105 B.R. at 849.

### A. *Partnership Agreements as Executory Contracts*

A threshold issue in an analysis of § 365 is the determination of whether the Partnership Agreements are executory contracts. The Movants state that every court which has considered the issue has held that partnership agreements are executory contracts. *See In re Priestley,* 93 B.R. 253, 258–59 (Bankr.D.N.M.1988); *In re Corky Foods Corp.,* 85 B.R. 903, 904 (Bankr.S.D.Fla.1988); *In re Sunset Developers,* 69 B.R. 710, 712 (Bankr.D.Idaho 1987); *Skeen v. Harms (In re Harms),* 10 B.R. 817, 821 (Bankr.D.Colo.1981). *See also In re Rittenhouse Carpet, Inc.,* 56 B.R. 131, 132–33 (Bankr.E.D.Pa.1985); and *CP Yorketown, Inc. v. Fidelity America Mortgage Co. (In re Fidelity America*

*Mortgage Co.),* 10 B.R. 781, 782 (Bankr.E.D.Pa.1981) (each assumed without discussion that a partnership agreement is an executory contract). The Movants also conclude that this Court has already reached the same decision. *See Cardinal Industries,* 105 B.R. at 849.

To date, no court in this circuit has squarely considered the issue.[1] Any assumption previously made by this Court is merely dicta. In the matter presently before this Court the Trustee has apparently conceded that the Partnership Agreements are executory contracts. Therefore, the issue is not contested and the Court will not address it further in this proceeding. Rather, for the purpose of this opinion, the Court will adopt the parties' agreement that the Partnership Agreements are executory contracts.

### B. *Ipso Facto Clauses*

A second threshold question raised by the Trustee is whether the Partnership Agreements or other applicable nonbankruptcy law include *ipso facto* clauses which the Movants purport to be validated by 11 U.S.C. § 365(e)(2). The provisions upon which the Movants rely as *ipso facto* clauses are found in Paragraph 14.03 of each of the Partnership Agreements and in the Revised Uniform Limited Partnership Act ("RULPA"), as adopted by both Ohio and Michigan. Paragraph 14.03 of the Partnership Agreements states in relevant part that, "... the General Partner(s) shall cease to be such upon the ... bankruptcy ... of the General Partner(s); and, upon the occurrence of such event, the General Partner(s) shall automatically cease to be a General Partner(s)...." RULPA, as adopted by Ohio and Michigan, similarly provides that unless all the partners at the time agree or unless otherwise provided for in the certificate of limited partnership, a person shall cease to be a general partner of a limited partnership upon the filing of a petition for himself seeking reorganization. *See* Ohio Rev.Code Ann. § 1782.23

(Anderson 1985) and Mich.Comp.Laws Ann. § 449.1402(3) (West 1989).

The Trustee argues that the term "bankruptcy" as used in Paragraph 14.03 refers only to a liquidation-type bankruptcy and does not include the reorganization of the Debtor under Chapter 11 of the Bankruptcy Code. He analogizes the use of the term here to its use in the Uniform Partnership Act ("UPA") and notes that various courts and commentators limited it there to liquidation proceedings since this was the only type of bankruptcy available when the UPA was promulgated. The Trustee contends that this interpretation is also consistent with the remaining portion of Paragraph 14.03 which says that, "... [t]he reformation or reorganization of the General Partner(s), should the General Partner(s) at any time be a corporation or partnership, shall not in and of itself constitute the retirement or resignation of the General Partner(s) as general partner of the Partnership for purposes of this paragraph 14.03." Thus, given this additional language, the Trustee claims that the issue of whether the RULPA *ipso facto* provisions are valid and enforceable against the Debtor arises only because this provision concerning reorganization found in Paragraph 14.03 is not also set forth in the certificates of limited partnership.

The Movants oppose the Trustee's interpretation of Paragraph 14.03. They argue that the term "bankruptcy" should be given its plain and ordinary meaning and that such a meaning encompasses more than simply liquidation. Further, in their view, case law construing "bankruptcy" under the UPA, promulgated in 1914, has no relevance to provisions of a partnership agreement drafted in the 1980's when "bankruptcy" clearly included reorganization. On the other hand, the Movants assert that the term "reorganization" as used in Paragraph 14.03 does not include reorganization under Chapter 11. Because "reorganization" is coupled with "reformation," they

---

1. In the case of *In re Norquist,* 43 B.R. 224, 227–28 (Bankr.E.D.Wash.1984), the court suggested that a partnership agreement would be an executory contract if it applied a "results" oriented test similar to that adopted by the Court of Appeals for the Sixth Circuit. *See Chattanooga Memorial Park v. Still (In re Jolly),* 574 F.2d 349, 351 (6th Cir.1978).

contend that together the words suggest a restructuring of the general partner entity and not a reorganization in bankruptcy. They find further support for their position in the fact that the "reorganization" referred to is expressly limited solely to corporate and partnership general partners whereas individuals, too, may reorganize under Chapter 11.

Because the Trustee apparently concedes the fact that RULPA, as adopted by Ohio and Michigan, contains an *ipso facto* clause and that the clause is not overridden either by agreement of all the partners or by a contrary provision in the certificates of limited partnership, this Court need not decide what the parties actually intended by their use of the terms "bankruptcy" and "reorganization" in Paragraph 14.03 of the Partnership Agreements. However, even if the Court were to accept the interpretation offered by the Movants, which the Court is inclined to do, the fact remains that the parties clearly contemplated a restructuring of the Debtor and the resulting possibility of a different management, and that the occurrence of this possibility would have no effect on the Debtor's status as general partner of the Partnerships.

## C. *Relevant Statutory Provisions*

The two provisions relevant to the Court's determination of this issue are subsections (c) and (e) of § 365 of the Bankruptcy Code. Those subsections provide in relevant part:

§ 365. Executory Contracts and Unexpired Leases.

(c) The trustee may not assume or assign an executory contract ... of the debtor, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment; or

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; or

(3) such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

\* \* \* \* \* \*

(e)(1) Notwithstanding a provision in an executory contract, ... or in applicable law, an executory contract ... of the debtor may not be terminated or modified, and any right or obligation under such contract ... may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract ... that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(2) Paragraph (1) of this subsection does not apply to an executory contract ... of the debtor, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to the trustee or to an assignee of such contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment; or

(B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

11 U.S.C. § 365(c) and (e) (references to unexpired leases omitted).

Resolution of the issue presented, the Movants' right to terminate the Debtor's Management Interest pursuant to *ipso facto* clauses contained in the Partnership Agreements, demonstrates the varying results achieved by applying conflicting theories of statutory interpretation. The Movants advocate giving effect to the plain meaning of the words found in the statutory provisions. The Trustee, however, urges the Court to look beyond the plain language of the statute to the legislative intent of the provisions and to the underlying concern addressed therein.

## D. *Plain Meaning of Statutory Language*

The Movants submit that a simple and straightforward reading of § 365 provides the appropriate analysis for resolving the issue. The Court must first examine the law applicable to the Partnership Agreements to determine if the agreements are executory contracts governed by § 365(c)(1). If the Partnership Agreements are executory contracts, the Court must then examine the agreements and applicable partnership law to ascertain if the Partnership Agreements are terminable upon the Debtor's filing for bankruptcy protection. And finally, if the Partnership Agreements are terminable, the Court must decide whether the agreements are terminable by the Movants' as nondebtor parties to the Partnership Agreements.

In the present case, having made the assumption that the Partnership Agreements are executory contracts, the Movants focus on the terminability of the Partnership Agreements. The Movants cite § 14.03 of the Partnership Agreements which provides:

The General Partner(s) shall cease to be such upon its effective resignation or retirement as such, *or the incapacity, bankruptcy or dissolution of the General Partner(s); and upon the occurrence of any such event, the General Partner(s) shall automatically cease to be a General Partner.* (emphasis added)

The Movants note that the relevant Placement Memoranda distributed for each of the Partnerships contained a similar provision. The Partnerships Agreements further provide that if the Debtor withdraws as a general partner, the limited partners have the right to elect a new general partner, *see* Partnership Agreements at §§ 14.02, 14.06; and the Debtor's Economic Interests are to be preserved and such interests are to be either satisfied or converted into limited partnership interests upon its withdrawal as general partner. *See* Partnership Agreements at § 14.06(c) and (d). Similarly, the Revised Uniform Limited Partnership Act ("RULPA"), as adopted in Ohio and Michigan, provides that a person ceases to be a general partner if he files a voluntary petition in bankruptcy, *see* Ohio Rev.Code Ann. § 1782.23(D) and (E) (Anderson 1985); Mich.Comp.Laws Ann. § 449.1402(3) and (4) (West 1989); and that a withdrawing partner is entitled to receive its share of distributions and the fair value of its interest in the limited partnership. *See* Ohio Rev.Code Ann. § 1782.34; Mich. Comp.Laws Ann. § 449.1604.

The Movants next contend that these *ipso facto* provisions of the Partnership Agreements and RULPA are validated by § 365(e)(2)(A) of the Bankruptcy Code. The critical language of § 365(e)(2)(A), according to the Movants, provides as follows:

(2) Paragraph (1) of this subsection [invalidating *ipso facto* clauses] does not apply to an executory contract ... of the debtor ... if—

(A)(i) applicable law excuses a party other than the debtor, to such contract ... from accepting performance from ... an assignee of such contract ...; and

(ii) such party does not consent to such assumption or assignment; ...

Citing *In re West Electronics Inc.*, 852 F.2d 79, 83 (3rd Cir.1988) (posing a similar hypothetical test under § 365(c)(1) which Movants contend is substantially similar to § 365(e)(2)(A)), the Movants argue that § 365(e)(2)(A) creates a hypothetical test: could the Movants refuse to accept per-

formance of the Debtor's Management Interest from an assignee? If so, the Movants argue that the Debtor's Management Interest is terminable, regardless of whether the Debtor has any intent to assign such interest.

In the alternative, the Movants appear to imply that the issue of assignability is not hypothetical in the present case. The Movants argue that partnership law does not permit the Debtor to assign its Management Interest to a third party without their consent, nor does partnership law require the Movants to accept performance of the Debtor's management duties by another. *See, e.g., Thomas v. Price,* 718 F.Supp. 598, 606–07 (S.D.Tex.1989); *Thomas v. Price,* 631 F.Supp. 114, 120 (S.D.N.Y.1986); *In re Sunset Developers,* 69 B.R. at 713; *Tyler v. Walde (In re Walsh),* 14 B.R. 385, 386–87 (Bankr.D.D.C.1981); *In re Harms,* 10 B.R. at 821. Likewise, Movants argue that RULPA provides for the assignment of a general partner's Economic Interest, but prohibits the assignment of its Management Interest. *See* Ohio Rev.Code Ann. § 1782.40; Mich.Comp.Laws Ann. § 449.1702. *See also* Ohio Rev.Code Ann. §§ 1782.22—1782.24; Mich.Comp.Laws Ann. §§ 449.1403, 449.1401, 449.24. Based upon the foregoing, the Movants conclude the Debtor's Management Interest is not assignable without the consent of the limited partners.

The Movants further argue that the prepetition debtor and the debtor in possession are separate and distinct legal entities. That distinction, argues the Movants, is more acute where a trustee has been appointed. Given the creation of a new legal entity, assumption of the Partnership Agreements by the Trustee on behalf of the estate would constitute an actual assignment of the Management Interest to a third party. Therefore, the Movants argue they have the right to terminate the Debtor's Management Interest pursuant to § 365(e)(2)(A) of the Bankruptcy Code, the Partnership Agreements and RULPA. *See In re Priestley,* 93 B.R. at 258–60; *In re Sunset Developers,* 69 B.R. at 712–13; *In re Harms,* 10 B.R. at 821–22. The Movants further conclude that the Supremacy

Clause is not relevant in this matter because there is no conflict between the Bankruptcy Code and state partnership law.

In response, the Trustee contends that the Movants' argument fails because it is premised upon an erroneous construction of § 365(c)(1). The Trustee argues that the construction of § 365(c)(1) by the *West* majority is erroneous because it is irreconcilable with the precise statutory language, contrary to the section's legislative intent, and contrary to the object and policy of Chapter 11. The Trustee submits that § 365(e)(2)(A) does not permit termination of the Debtor's Management Interest pursuant to an *ipso facto* clause where, as here, a corporate debtor continues to perform its contractual obligations under the Partnership Agreements. The literal application of these provisions, argues the Trustee, makes no sense. Therefore, the Court must look to the legislative history and ascertain the intent of Congress.

To illustrate his point, the Trustee provides a few examples of how a hypertechnical reading of the words leads to a nonsensical result. The first concerns the relationship between §§ 365(c)(1) and (f)(1). Section 365(f) provides in relevant part:

> (f)(1) *Except as provided in subsection (c) of this section,* notwithstanding a provision in an executory contract ... of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract ... the trustee may assign such contract ... under paragraph (2) of this subsection.

> (2) The trustee may assign an executory contract ... of the debtor only if—

> (A) the trustee assumes such contract ... in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract ... is provided, whether or not there has been a default in such contract....

> (3) Notwithstanding a provision in an executory contract ... of the debtor, or in applicable law that terminates or modi-

fies, or permits a party other than the debtor to terminate or modify, such contract ... or a right or obligation under such contract ... on account of an assignment of such contract ..., such contract, ..., right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract ... by the trustee.

11 U.S.C. § 365(f) (emphasis added). According to the Trustee, the Movants reason that any time applicable law prohibits assignment of an executory contract such contract would be governed by subsection (c)(1). If that result were in fact the case, the provisions regarding assignment of executory contracts contained in subsection (f)(1) would be rendered meaningless.

Further, the Trustee argues that if nonassignability of a contract is sufficient as a matter of law to preclude assumption by the trustee, then there was no reason for Congress to provide that the trustee "may not assume *or assign*" such contracts. Given that § 365(f)(2)(A) requires that a trustee must first be able to assume an executory contract before it can be assigned, the Trustee contends it would have been sufficient to simply state in subsection (c) that the trustee cannot assume such contracts. The inclusion of the words "or assign" in § 365(c)(1) would not be superfluous, however, if the nonassignability of a contract under applicable state law does not necessarily preclude a debtor from assuming the contract for the purpose of performing its prepetition delegations under the contract. To the contrary, the Trustee argues that the inclusion of the words "or assign" to subsection (c)(1) serves the function of clarifying that the debtor in such circumstances may be able to *assume* but not *assign* an executory contract. This interpretation, suggests the Trustee, is consistent with other provisions of the Bankruptcy Code. *See* 11 U.S.C. §§ 365(b)(1), 365(d) and 1123(a)(5)(A) and (G).

This argument is enhanced by an examination of the text of § 365(c)(1) as originally enacted, which provided:

> (c) The trustee may assume or assign an executory contract ... of the debtor, ..., unless—
>
> (1) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to *the trustee or an assignee* ....

11 U.S.C. § 365(c)(1) (1982). The Trustee questions why, if the only relevant inquiry is whether applicable law excuses the nondebtor party from accepting performance from a "hypothetical" assignee, there would have been any reason for Congress to have separately provided that assumption by the trustee was barred where applicable law excused the nondebtor party from accepting performance from or rendering performance to *the trustee.* The Trustee contends this inquiry is relevant in the present case because the same language that originally appeared in subsection (c)(1) still appears in subsection (e)(2)(A).

Finally, the Trustee suggests that the literal test under § 365(e)(2)(A) is not whether applicable law excuses the nondebtors from accepting performance *from* an assignee, but rather whether the nondebtors are excused from rendering performance *to* an assignee. The Trustee notes the precise wording in § 365(e)(2)(A)(i) reads:

> applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to the trustee *or to an assignee* of such contract....

The subsection does not read:

> ... from accepting performance from or rendering performance to the Trustee *or from or to an assignee*....

The subsection simply reads "to an assignee." The Trustee argues it is clear that applicable law does not excuse these nondebtor limited partners from rendering performance to an assignee. The performance required of limited partners is the payment of their investor notes, many of which have been assigned. There is nothing under applicable state law that prevents the assignment of those notes, nor any provision

which excuses the limited partners from performing their obligation to pay the investor notes to an assignee.

 The rules of statutory construction require foremost that the intention of the legislature be given effect. *In re Law,* 37 B.R. 501, 511 (Bankr.S.D.Ohio 1984). The starting point in determining legislative intent is the language of the statute itself. *Vause v. Capital Poly Bag, Inc. (In re Vause),* 886 F.2d 794 (6th Cir.1989), *citing, Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). However, even when the statutory language appears plain, the legislative history must be examined to ascertain congressional intent. *Vause,* 886 F.2d at 801 n. 11, *citing, United States v. Stauffer Chemical Co.,* 684 F.2d 1174, 1183 (6th Cir.1982), *aff'd,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). Further, the rules of construction require that "effect is to be given, if possible, to every word of a statute." *Abney v. Fulton County (In re Fulton Air Service, Inc.),* 34 B.R. 568, 572 (Bankr.N.D.Ga.1983) *citing, United States v. Menasche,* 348 U.S. 528, 538, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955). *Accord* 24 Sutherland, *Statutory Construction* § 46.06 at 63 (4th ed. 1973) (a statute should, if possible, be "construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") Given the uncertainty raised by the Trustee regarding the plain meaning of § 365 and the mandate of prior case law to give effect to the legislative intent, this Court is compelled to examine the legislative history of § 365 to determine the true legislative intent of the section and cannot merely apply the language of § 365 in a literal manner.

### E. *Legislative History*

The present language of § 365 was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), Pub.L. No. 98–353, 98 Stat. 333 (1984), *reprinted in* Appendix 1, L. King, *Collier on Bankruptcy* 1585 (15th ed. 1989). BAFJA was enacted in 1984 primarily to rectify the constitutional crisis stemming from the decision of the Supreme Court in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and to address that Court's decision regarding the rejection of collective bargaining agreements in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Congress took the opportunity, however, to incorporate several other acts involving the Bankruptcy Code, many of which had been pending in Congress for a few years but lacked the impetus to be enacted. One such act was The Technical Amendments Act of 1980, which sought to "correct technical errors, clarify and make minor, substantive changes" to the Bankruptcy Reform Act of 1978. H.R. Rep. No. 1195, to accompany S. 658, 96th Cong., 2d Sess. (1980).

Given the urgency with which BAFJA was passed, its legislative "history" is comprised solely of statements inserted rather than actually read into the Congressional Record. 130 Cong.Rec.H. 7471–7500 (daily ed. June 29, 1984); 130 Cong.Rec.S. 8886–8900 (daily ed. June 29, 1984); *reprinted in* Appendix 3, *Collier on Bankruptcy* Part XX (15th ed. 1989). Consequently there is no authoritative legislative history for BAFJA as enacted in 1984. Likewise there is no authoritative legislative history for its component acts as enacted in 1984. The Movants argue, therefore, that the Court should consider the report issued in 1973 by the Commission on the Bankruptcy Laws of the United States (the "Commission"). Report of Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–1371 93d Cong. 1st Sess., Part II (1973), *reprinted in* Appendix 2, *Collier on Bankruptcy* Part I. The Trustee argues, however, that the legislative history of The Technical Amendments Act of 1980 is a more appropriate indication of legislative intent when Congress amended § 365.

The Court agrees with the Trustee that the legislative history for The Technical Amendments Act provides the best guid-

ance for interpreting the Congressional intent behind § 365. Besides the mere passage of time between 1973 when the Commission issued its report and 1984 when BAFJA was enacted, the Commission was not comprised of legislators who drafted the eventual legislation. In fact, the language upon which the Commission's report was based bears little resemblance to the language of § 365(c)(1) as amended in 1984. And, while The Technical Amendments Act was originally drafted by the Senate, it was the language of the House amendment to the Act that eventually was adopted by BAFJA in 1984. BAFJA, Title III, Subtitle C—Leasehold Management Amendments § 362(a). Senate approval of the House amendment can be inferred from the inclusion of the amendment's language in subsequent bills drafted and passed by the Senate during the interim years. *See* Bankruptcy Court And Federal Judgeship Act of 1983, S. 1013, S.Rep. No. 98–55, 98th Cong., 1st Sess., Subtitle C—Leasehold Management Amendments § 552(a) (1983); Omnibus Bankruptcy Improvements Act of 1983, S. 445, S.Rep. No. 98–65, 98th Cong., 1st Sess., Subtitle C—Leasehold Management Amendments § 252(a) (1983).

■ Section 362(a) of BAFJA amended 11 U.S.C. § 365(c)(1)(A) by substituting the phrase "an entity other than the debtor or the debtor in possession" for the words "the trustee." 11 U.S.C. § 365(c)(1)(A) (Supp. II 1985). The legislative history for this change provides:

> This amendment makes it clear that the prohibition against a trustee's power to assume an executory contract does not apply where it is the debtor that is in possession and the performance to be given or received under a personal service contract will be the same as if no petition had been filed because of the personal service nature of the contract.

H.R.Rep. No. 1195, 96th Cong., 2d Sess. § 27(b) (1980). This comment clearly indicates that Congress did not intend § 365(c)(1) to preclude assumption of an otherwise nonassignable personal service contract if the performance to be given or received "will be the same as if no petition

had been filed." Rather, as the Trustee argues, § 365(c)(1) provides that a debtor in possession can assume a personal service contract that is nonassignable under state law as long as its performance is going to be the same as if no petition had been filed. Therefore, the hypothetical test established in *West* is clearly not appropriate under § 365(c)(1).

It is important to note that the actual language of subsection (c)(1) states "the debtor or the debtor in possession" and not simply "debtor in possession." This fact is significant because it indicates that Congress must have contemplated performance by a debtor not in possession. That is precisely the situation in the present case where an operating trustee has been appointed. Further, the Court finds it understandable that the legislative history does not refer to a corporate debtor. Typically, performance of a contract in the nature of a "personal" service contract does not involve a corporate entity.

■ The finding that a debtor or a debtor in possession can assume and perform a personal service contract notwithstanding the fact that such contract is otherwise barred from assumption under § 365(c) because it is unassignable, does not mean that a trustee could always assume such a contract, however. Section 365(c) continues to bar the trustee from assuming a contract in those cases where applicable law excuses the nondebtor from accepting performance from the trustee. Such a situation would occur in a case proceeding under Chapter 7 if the trustee sought to assume and perform a personal service contract.

Although unnecessary for the Court's determination, the Trustee also demonstrated that the hypothetical test established in *West* was not appropriate even prior to the 1984 amendment of § 365(c)(1) by BAFJA. The Movants rely upon the House comments to the original language of § 365(c) proposed by the House. That original language referred to "applicable law excusing a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to the

trustee or an assignee of such contract...." H.R. 8200, 95th Cong., 1st Sess., 370 (1977), *reprinted in* Appendix 3, *Collier on Bankruptcy* Part III. The comment to subsection (c) set forth that the purpose of the subsection was at least in part to "prevent the trustee from requiring new advances of money or other property." The comment concluded that under this provision, "contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the trustee." Report of the Committee of the Judiciary, House of Representatives, to accompany H.R. 8200, H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 348 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787, *reprinted in* Appendix 2, *Collier on Bankruptcy* Part II. The Movants reason that since the loan agreements were not assignable, Congress believed the agreements could not be assumed by the trustee. Therefore, the Movants argue that the comment substantiates the hypothetical test.

A review of the Senate's comments to its own version of the bill and the language eventually adopted by Congress suggests a different conclusion, however. Although H.R. 8200 was sent to the Senate for its consideration after the House passed the bill, the Senate Judiciary Committee decided to consider and favorably report its own bill. S. 2266, 95th Cong., 2d Sess. (1978), *reprinted in* Appendix 3; *Collier on Bankruptcy* Part VII. The bill, as reported, was accompanied by a committee report. Report of the Committee on the Judiciary, United States Senate, to accompany S. 2266, S.Rep. No. 95–989, 95th Cong.2d Sess. (1978), *reprinted in* Appendix 3, *Collier on Bankruptcy* Part V. *Collier's* notes that much of S. 2266 was identical to H.R. 8200. In fact, the portion of § 365(c) relevant to this matter was identical in both bills. *Collier's* also notes that many portions of the Senate Report are identical to the House Report. The reports did differ, however, in three respects. The one relevant to the Court's determination is the section-by-section analysis of the Senate Report which differs from the House Report for those sections where both bills contained the same language but the Senate Judiciary Committee interpreted the language differently than the House Judiciary Committee did. Appendix 3, *Collier on Bankruptcy* Part V–1.

The Senate Report on § 365(c) does not contain any of the language relied upon by the Movants. There is no statement as to whether or not this provision prohibits assumption of loan commitments by the trustee because they are nonassignable. Instead, the Senate added a separate provision not included in H.R. 8200. The subsection, § 365(b)(4), provided "notwithstanding anything to the contrary contained in this section, the trustee may not assume an executory contract to make a loan or deliver equipment to or to issue a security of the debtor." S. 2266, 95th Cong., 2d Sess., 365–66. The comment pertaining to this additional provision indicates that the purpose of the subsection was "to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor" under any circumstances. S.Rep. No. 95–989, 95th Cong., 2d Sess., 58–59, U.S.Code Cong. & Admin.News 1978, pp. 5844–45.

The Trustee argues that the Senate added this separate provision to preclude a debtor in possession from assuming contracts that would not necessarily be precluded under the Senate's interpretation of § 365(c)(1). Contrary to the Movants' argument, the Trustee contends that the Senate never interpreted § 365(c)(1) to require a hypothetical test. Consequently, the Senate determined that if it wanted to prevent the assumption of such contracts then it had to expressly prohibit that in a separate provision. The Trustee further contends that when the two bills were merged, the Senate's interpretation prevailed. Rather than rewrite subsection (c)(1), Congress enacted the Senate's provisions of subsection (b)(4) as 11 U.S.C. § 365(c)(2). Therefore, the Trustee concludes that if subsection (c)(1) required a hypothetical test, then subsection (c)(2) would be rendered superfluous.

### F. *Policy Considerations*

As a final argument, the Trustee contends that the hypothetical test posited in *West* contravenes the object and policy of Chapter 11 relief. If the ultimate goal of Chapter 11 is the rehabilitation of a debtor's enterprise, the Trustee questions the wisdom of preventing the estate from assuming an executory contract which potentially is its most valuable asset, solely because the contract cannot be assigned to a hypothetical third party. The Trustee argues that if applicable nonbankruptcy law does not excuse the Movants from accepting performance from the Debtor, then the Bankruptcy Code should not be interpreted to prevent the estate, as represented by an operating trustee, from assuming the Partnership Agreements to be performed by the Debtor as managed by the operating Trustee, solely because of a "hypothetical" inability of the estate to assign its rights under the contracts.

The Trustee contends the issue of assignability is hypothetical because the Trustee and the Debtor are the same entity. The appointment of an operating trustee for a corporate debtor proceeding under Chapter 11 has a different effect from the appointment of a trustee in a Chapter 7 case. Regardless of who is managing the Debtor, the Trustee argues, in this case it will be the debtor corporation that performs the contracts. That fact, according to the Trustee, distinguishes the present case from those cases which hold that when a general partner files bankruptcy, he becomes a different entity and therefore the limited partners do not have to accept performance from the general partner. *See In re Harms*, 10 B.R. at 822; *In re Sunset Developers*, 69 B.R. at 712–13. *See also In re Priestley*, 93 B.R. at 258–60 (the debtor's Chapter 11 case had been converted to Chapter 7 before the issue was raised). The Trustee also argues the separate entity theory was discredited by the Supreme Court in the *Bildisco* decision. 465 U.S. at 517 n. 2 and 528, 104 S.Ct. at 1192 n. 2 and 1197.

■ This Court believes that where an operating trustee has been appointed to manage a corporate Chapter 11 debtor, the separate entity theory is not applicable in the context of the continued viability of an executory contract. The theory is not applicable, not because the Debtor corporation and the Trustee are the same entity, but because the entity performing the contract, should it be assumed, will be the same entity which was a party to the original contract. In this circumstance, the postpetition debtor in Chapter 11 is not a different legal entity from its prepetition entity.[2] The contemplated performance of the contract will not be by the Trustee individually, but will be by the Debtor as managed by the Trustee. Therefore, assumption of the contracts by the Trustee on behalf of the estate with performance by the Debtor would not constitute an assignment within the meaning intended by § 365(c)(1)(A) or § 365(e)(2)(A). Further, this type of corporate management change in the Debtor corporation was not prohibited by the terms of the Partnership Agreements.

■ However, after the Chapter 11 filing a debtor, whether in possession of the estate or being managed by an operating trustee, acts for different interests than it acted for prior to the filing. Especially where the estate is insolvent, the representative of the estate acts for the benefit of the creditor body. When taking such actions the estate's representative has heightened powers specifically granted in the Bankruptcy Code. See 11 U.S.C. § 544–550 and § 365. It is the perceived benefit to the estate which determines whether a contract is executory and whether it should be assumed. *Jolly*, 574 F.2d at 351. And it is a balancing of the estate's right to determine whether to assume or reject its executory contracts against the

**2.** This Court's previous finding that an individual debtor and a Chapter 7 Trustee are separate entities for purposes of an analysis of setoff rights against the estate does not change this result. *See Smith v. O'Mara Enterprises, Inc. (In re Smith)*, 100 B.R. 330, 337 (Bankr.S.D.Ohio 1989). That separation is required by the statute governing rights of setoff. *See* 11 U.S.C. § 553.

rights of the nondebtor parties to those executory contracts that is at the heart of 11 U.S.C. § 365(c) and (e)(2). If there is a material change in the identity of the person rendering the performance under the contract, the identity of that person is an essential element of the contract, and the contract is nonassumable under applicable nonbankruptcy law, then the estate can not assume the contract. The reason for that result is that assumption other than by agreement may result in prejudicial harm to the nondebtor party. Where the Trustee's assumption, as the representative of the estate, would not change the essential identity of the entity performing the services under the contract, the exception is not effective. In that situation the nondebtor party is not prejudiced, nor is his essential bargain affected by the assumption. The Chapter 11 filing, therefore, should not provide a fortuitous event which excuses the nondebtor party from further performance if that performance is beneficial to the estate and if the estate can otherwise meet the tests for assumption. Certainly the nondebtor party should not be free to unilaterally terminate the estate's rights prior to its determination whether the contract will be assumed or rejected. The analysis would be different if an actual assignment to a separate third party were proposed or contemplated.

■ Section 365(e)(2), which is an exception to the *ipso facto* invalidation provided by § 365(e) generally, is meant to reflect the same philosophy. If the contract is neither assumable nor assignable under § 365(c), invalidating the *ipso facto* clause serves no purpose. Where the contract may be assumed, because assumption by a trustee on behalf of the estate results in the debtor's performance of the contract in a Chapter 11 case, invalidation of *ipso facto* clauses should be the rule, however, either under 11 U.S.C. § 365(e)(1) or by application of the Supremacy Clause generally. A general partner which is eligible for Chapter 11 relief and its operating trustee should not have the means for reorganization taken away because of *ipso facto* bankruptcy termination provisions either in executory contracts or in nonbankruptcy

law. That result would harm the estate where assumption would benefit creditors without harm to the other party to the contract.

■ Based upon the foregoing, the Court finds that the Debtor's Management Interest was not terminated by its bankruptcy filing pursuant to 11 U.S.C. § 365(e)(2)(A) and the *ipso facto* clauses are not to be given effect under the circumstances presently before the Court. Applicable nonbankruptcy law does not prohibit assumption of the Partnership Agreements by the Trustee on behalf of the estate simply because the agreements are not assignable to a third party. And, assumption by the Trustee on behalf of the estate when the performance is to be rendered by the Debtor for the benefit of the estate is not an assignment. Therefore, the automatic stay was not lifted as a matter of law and the Movants are not permitted to remove the Debtor as general partner.

II. Relief From The Automatic Stay For Cause Under 11 U.S.C. § 362(d)(1)

At the outset, the Movants contend that they are not seeking to affect the Debtor's right to participate in the profits or losses, distribution and proceeds of the Partnership ("Economic Interest"). The Debtor's Economic Interest, under their scenario, would merely be converted to that of a special limited partner, and the Debtor would enjoy the same percentage economic interest as before. Their ouster of the Debtor as general partner, thus, would affect only the Debtor's Management Interest as previously defined by this Court. The Trustee argues that while the Movants' perception of the impact their actions will have on the estate may be semantically correct, the loss of the Debtor's Management Interest would unquestionably cause significant economic harm.

■ Section 362(d) of the Bankruptcy Code provides in relevant part:

On request of a party in interest and after notice and hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by

terminating, annulling, modifying, or conditioning such stay—

　(1) for cause, including the lack of adequate protection of an interest in property of such party in interest. . . .

11 U.S.C. § 362(d)(1).

The determination of whether "cause" exists under § 362(d)(1) is essentially a balancing test.

　In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code. In considering whether "cause" exists to modify the stay, the court must look at the totality of the circumstances.

*In re Opelika Mfg. Corp.*, 66 B.R. 444, 449 (Bankr.N.D.Ill.1986) (citations omitted). The Court's focus must be on the harm occasioned by the imposition of the stay itself. *Id.* at 448 ("cause to lift the stay exists when the stay harms the creditor"); Ginsberg, *Bankruptcy* para. 3306 (1985) ("a creditor can seek to have the stay lifted for cause when [the creditor] is hurt by the stay").

The Movants allege four common elements of harm: (1) their inability to proceed with contractual and state law remedies; (2) conflicts of interest between the Debtor's role as general partner of the Partnerships and its fiduciary duties to its creditors as a debtor in possession; (3) the Debtor's inability to provide accounting and reporting information to limited partners when requested; and (4) the possibility of adverse tax consequences to limited partners resulting from an insolvent general partner. In addition, the Movants cite elements of harm that are unique to each of the three partnerships.

In response, the Trustee argues that many of the elements of harm identified by the Movants do not stem from the imposition of the automatic stay. Rather, the Trustee contends such harms are the result of the Debtor's prepetition conduct and continuing financial difficulties. The Trustee further asserts that the Debtor has made meaningful efforts to improve accounting and reporting procedures. Further, the Trustee points out that it was because of continuing problems of credibility that this Court recently appointed an operating trustee. While he acknowledges the validity of the Movants' concerns, the Trustee argues that the harms to the Movants actually occasioned by the imposition of the stay are minimal.

In comparison, the Trustee argues that the Debtor's right to control and manage the partnerships is a critical asset of the estate and the loss of such an asset would result in far greater harm to that estate than benefits to the Movants would justify. While not defined as an economic interest, the loss of the Debtor's Management Interest would undoubtedly result in significant economic harms. The Trustee contends that it is the right to determine who will manage the partnership properties and the right to control the management that ensures value for these Partnerships. In addition, any reduction in the Debtor's Management Interests would diminish the value of CAMG, another important asset of this bankruptcy estate. The Trustee stresses the significance that must be given to the vertical integration of the Debtor's organization when balancing the relative harms.

■■■ Under circumstances such as these, where the Debtor's primary business is that of being a general partner, Congress could not have intended that mere delay in enforcing certain rights granted under the Partnership Agreements would be "cause" for lifting the automatic stay. The deprivation of some contractual or state law remedy occurs in virtually every bankruptcy case. If the mere assertion that delay of such a remedy was sufficient to establish cause, the imposition of the stay to protect a debtor would prove meaningless. This Court believes that where a reorganization effort is ongoing, the Movants must show more than a delay in their ability to exercise rights granted under the Partnership Agreements. The Movants must demonstrate continuing postpetition harm that is specifically attributable to their inability to exercise those rights. In

this case, no such showing was made by the Movants in any significant manner.

■ Further, the Court finds that in the context of a Chapter 11 reorganization, the Movants' allegations of potential conflicts of interest are not sufficient to justify relief from the automatic stay to replace the Debtor as general partner. Limited partners in partnerships where the debtor is a general partner must show harm attributable to postpetition breaches by the debtor of its fiduciary duties to those limited partners. In the present case, the Movants are sophisticated investors who clearly understood the nature of the Debtor's business and were well informed about existing and potential conflicts of interest, many of which were disclosed in the partnership offering memoranda. The Court also is not convinced that the Debtor's fiduciary duties to its own creditors actually are in conflict with its fiduciary duties to the limited partners of partnerships for which it serves as general partner. No specific instances of conflict were the subject of testimony and it appears theoretically possible for an entity to appropriately hold fiduciary duties to more than one group so long as the two groups' interests are not actually adverse to one another. As such, the Movants, like most other parties involved in the Cardinal enterprise reorganization effort, will have to wait out the process to see whether or not the Debtor can reorganize in a reasonable time.

However, to merit the continued protection, the Court concurs with the Movants that the Debtor must proceed to improve the reporting and financial accounting to which the Movants are entitled. Without such information the Movants are unable to properly determine if and to what extent they are being harmed postpetition. The Court hopes and expects that past problems in this area will be corrected given the recent appointment of an operating trustee in this case.

Finally, the Court finds that no specific evidence was presented of adverse tax consequences occasioned by the stay.

■ Likewise, the Court does not believe that the circumstances specific to each of the Partnerships raises to the level of "cause" to grant relief from the automatic stay. The financial condition of each of these Partnerships has significantly improved, and the problems cited by the Movants have, for the most part, been resolved. The Movants presented no evidence that vendors are not currently being paid or that the services previously cut off are not now being provided; or that the mortgages and real estate taxes are not being paid. The Movants also failed to show that any of the postpetition transfers from these Partnerships was improper. To the contrary, the Movants concede in their reply brief that some of the transfers my have been legitimate. They claim, however, that the burden of proving the validity of the transfers lies with the Trustee in order to show that cause does not exist for relief from the automatic stay under § 362(d). The Court feels that when the Movants have failed to establish even a prima facie case of impropriety, the burden upon the Trustee is minimal. In this case, the Trustee has provided a satisfactory explanation and, in the absence of any evidence contradicting its explanation, he has sufficiently shown that no cause exists to lift the stay as a result of these transfers.

■ Conversely, if relief from the stay were granted, the Debtor would experience substantial harm. The loss of the right to manage and control the Partnerships would directly impair the most basic, and at present, the primary profitable aspect of its business. This fact carries greater significance when, as here, it involves some of the Debtor's better properties. Further, relief from the stay to these Movants would contribute to a diminution in value of these apartment complexes and correspondingly decrease the value of CAMG, if sold. CAMG is also an asset of the Debtor's estate by virtue of the Debtor's ownership of CAMG's equity shares.

Based upon the foregoing, the Court also finds that "cause" has not been shown for relief from the stay pursuant to § 362(d)(1) and the automatic stay should remain in effect at least until the Debtor has had a reasonable opportunity to reorganize. If

the Debtor is not able to reorganize within a reasonable time, or if new postpetition harms occur, the Movants may again seek relief from the automatic stay on those grounds.

IT IS SO ORDERED.