In re Warren B. SIEGAL and Alexandra Siegal, Debtors.

Dain K. CALVIN and Clayton W. Plotkin, Movants,

v.

Warren B. SIEGAL and Alexandra Siegal, Respondents.

Bankruptcy No. B–93–6932–PHX–CGC.

United States Bankruptcy Court, D. Arizona.

Jan. 12, 1996.

Jim D. Smith, Yuma, AZ, for Debtors.

David Engelman, David Wm. Engelman, P.C., Phoenix, AZ, for Dain K. Calvin and Clayton W. Plotkin.

Brend K. Martin, Johnston, Maynard, Grant & Parker, P.L.C., Phoenix, Arizona, for F.D.I.C.

## ORDER RE MOTION TO LIFT AUTOMATIC STAY

CHARLES G. CASE II, Bankruptcy Judge.

### I. INTRODUCTION

Before the Court is a Motion for Relief from the Automatic Stay, filed on June 16, 1995 by Dain K. Calvin and Clayton W. Plotkin ("Movants"). In the Motion, Movants urge the court to vacate the stay to allow them to wind up the affairs of an entity called the Third Street Partnership (the "Partnership"). Debtors Warren B. Siegal and Alexandra Siegal ("Debtors" or "Siegals") filed an objection to the Motion June 30, 1995. Movants argue that the filing of this Chapter 11 bankruptcy by Debtors, who are partners in the Partnership, automatically dissolved the Partnership pursuant to applicable state law; Debtors disagree.

A preliminary hearing on the Motion was conducted on August 1, 1995 and the parties were directed to file briefs on the issues. The Movant's brief and exhibits to the declaration of Clayton Plotkin were filed on September 1, 1995; Debtors' brief was filed September 14, 1995. A continued preliminary hearing was held on September 28, 1995 and the Court modified the stay to allow the Movants to file an action to dissolve the Partnership for reasons other than those arising out of the bankruptcy. The question of whether the bankruptcy of Debtors caused

a dissolution of the Partnership was then taken under advisement.[1]

### II. FACTS

In June, 1977, a partnership agreement (the "Partnership Agreement") was entered into by Debtor Warren Siegal and two other individuals. The Partnership Agreement provides that the "principal business" of the Partnership is investment in real property. Partnership Agreement ("PA") p. 1. An Amended Certificate of Partnership Doing Business Under Fictitious Name, filed on January 18, 1982 with the Maricopa County Recorder, provides that "[t]he general nature of the business is: Investment, development and utilization or real estate and improvements." The Partnership Agreement provides that the term of the Partnership shall continue until December 31, 2002, and thereafter from year to year as provided therein. PA p. 1. Finally, the Partnership Agreement provides that partners may sell, encumber or otherwise dispose of their interests to other individuals, subject to a right of first refusal in favor of the Partnership first and then to each of the partners. PA pp. 7–8. Siegal's original partners sold or lost their interests in the Partnership and Movants became Siegal's new partners. The current partners do not agree on their respective ownership shares; until recently, Siegal held 33⅓%, each of the Movants held 16.67% with the remaining 33⅓% held by Meyer Ziman. The partnership has forfeited the interest of Mr. Ziman; Siegal apparently contends that he now holds at least 50% and the Movants contend that they have absorbed the ex-

---

**1.** The Movants argue that dissolution was automatic upon filing. Even if they are correct that dissolution results from the filing, the automatic stay would prevent actual dissolution in the absence of an order lifting the stay.

The Ninth Circuit addressed a related issue in *In re Computer Communications, Inc.*, 824 F.2d 725 (9th Cir.1987). In that case, the debtor was a party to a contract for the supply of goods. The contract allowed either party to automatically terminate the contract if the other filed bankruptcy. When the debtor filed bankruptcy, the other party terminated the contract. The Ninth Circuit affirmed the bankruptcy court's award of substantial damages against the non-debtor party for violation of the automatic stay. In so holding, the Ninth Circuit stated:

The bankruptcy court held that § 365(e)(2) did not permit Codex to terminate the contract unilaterally finding that the Amended Agreement was not a contract for personal services. Likewise, the district court concluded that the contract was almost entirely for the sale of goods. We need not reach that question, however, because we hold that even if § 365(e)(2) allowed Codex to terminate the contract, § 362 automatically stayed termination.

*Id.* at 730. Under *Computer Communications*, the Partnership Agreement in the instant case will dissolve, if at all, only after an order lifting the stay to allow dissolution.

penses otherwise allocable to Ziman and therefore have succeeded to his interests.

Months after the filing of this bankruptcy case, on October 6, 1994, the Partnership filed an Amended Certificate of Partnership Doing Business Under Fictitious Name, and listed Siegal and each of the Movants as the only individuals authorized to act as partners for the Partnership and specifically stated that Ziman no longer was a partner of the Partnership. This action was taken substantially contemporaneously with the forfeiture of Ziman's interest.

The Partnership owns real property located at 1111 North 3rd Street, Phoenix, Arizona 85004 (the "3rd Street Building"). Warren Siegal and Movants are all attorneys who practice law from their offices located at the 3rd Street Building. The Partnership leases the 3rd Street Building to the partners through their professional corporations. It also has space in the 3rd Street Building available to lease to other attorneys. The rental income from all of the leases is barely sufficient to cover the debt service on the 3rd Street Building.

During the pendency of the Motion, Movants alleged that Debtors' capital contributions to the Partnership were delinquent, but in their final briefs, Movants admit that Debtors recently brought their obligations current.

## III. DISCUSSION

The issue in this case is whether a debtor's Chapter 11 bankruptcy filing causes a dissolution under state law of the real estate general partnership in which the debtor is a general partner.

### A. The Concept of Dissolution

"Dissolution" is a state law concept peculiar to partnership law. Partnership is a voluntary association of entities; dissolution results when one or more partners leaves the partnership. As explained by a leading commentator:

A dissolution of a partnership does not necessarily mean that the business of the partnership must be discontinued. Upon a dissolution, the affairs of a partnership are to be "wound up." This may take the form of a liquidation of the partnership's business, but also may be accomplished by a reconstitution of the partnership as a new entity and the continuation of the business of the former partnership without the participation of the departed partner. Thus dissolution does not always adversely affect the remaining partners, but necessarily affects the rights and investment of the departing partner.

Cherkis, *The Effect of a General Partner's Bankruptcy on the Partnership and its Creditors,* Practicing Law Institute (1991), at 3.

■ Thus, dissolution does not mean termination of a partnership or cessation of its business. However, because partnership is consensual and because a general partner is an agent for the partnership and derivately for the other partners, dissolution does terminate the departing partner's power to act for the partnership and to participate in further managerial decisions. The departing partner's economic interest remains intact, however, and is paid out pursuant either to state law or the partnership agreement.[2]

Events of dissolution are found in two primary sources: the agreement itself and applicable state law. Although many partnership agreements contain provisions that state that the bankruptcy filing of a general partner dissolves the partnership and that provide a formula for the payment of that partner's economic interest, this one does not. Therefore, the first inquiry here must be to state law.

### B. The Uniform Partnership Act

■ Arizona has adopted a modified version of the Uniform Partnership Act ("UPA"). Ariz.Rev.Stat.Ann. § 29–231 provides that "[d]issolution is caused.... [b]y the bankruptcy of any partner or the partnership." This provision is substantially

---

**2.** If the pay out scheme provided in the agreement for a debtor partner is contrary to the Bankruptcy Code, then it may be overridden by principles of federal law. *See, e.g., In re Cutler,* 165 B.R. 275 (Bankr.D.Ariz.1994).

identical to Section 31 of the UPA. The first question is whether "bankruptcy" in the UPA includes Chapter 11 reorganization or only refers to Chapter 7 liquidation. Courts are divided on this issue and there is no controlling precedent.

In *In re Safren*, 65 B.R. 566 (Bankr. C.D.Cal.1986), a case frequently cited on this issue, the debtor was a general partner in Seaport Village Redondo Beach, a California general partnership ("Seaport"). Seaport filed a Chapter 11 petition in September, 1982. Subsequently, involuntary Chapter 11 petitions were filed for the two general partners of Seaport in October, 1982 and orders for relief were entered in those cases in December, 1982. The reorganization of Seaport was unsuccessful and Seaport's assets were lost through foreclosure in March 1985; the case was then dismissed in September, 1985.

The wives of the two partner debtors subsequently filed Chapter 11 cases and the Court confirmed a joint plan for the two couples in June, 1986, approving substantive consolidation of the four individual cases (the "Consolidated Cases"). A creditor of Seaport alleged that his claim was entitled to administrative priority in the Consolidated Cases.

The *Safren* court first considered whether the California state version of the UPA worked an automatic dissolution of Seaport upon its bankruptcy filing. Answering that question in the negative, the *Safren* court then considered whether the bankruptcies of the two partners automatically worked a dissolution of Seaport under the state statute. In concluding that neither bankruptcy had that effect, the court explained:

> The Uniform Partnership Act was promulgated ... in 1914, when the only kind of bankruptcy available was a liquidation similar to that available under Chapter 7.... Thus, when the national Conference of Commissioners on Uniform State Laws wrote section 31(5), they did not contemplate that it would apply to any kind of bankruptcy other than liquidation, because no other kind of bankruptcy existed. In consequence, the Court must look to policy considerations to determine whether section 31(5) should be extended to Chapter 11 · partnership bankruptcy cases. *Id.* at 569.

Turning to public policy considerations, the *Safren* court concluded that automatic dissolution based upon bankruptcy filings would frustrate the purpose of reorganization. Because the dissolution of a partnership could have serious tax consequences that could make reorganization impossible, the court declined to hold that a Chapter 11 bankruptcy filing by either a partnership or a general partner could work an automatic dissolution of the partnership under state law.[3]

*Safren* has been both followed and criticized. For example, *In re Hawkins*, 113 B.R. 315 (Bankr.N.D.Tex.1990), followed *Safren*. In *In re Phillips*, 966 F.2d 926, 931 (5th Cir.1992), however, the Fifth Circuit concluded that the UPA's reference to a bankruptcy includes a debtor in a Chapter 11 and stated that it "think[s] that *Safren* is wrongly decided." The *Phillips* court, however, was faced with a different set of facts where the partnership at issue was dissolved prepetition by a state court judgment. In *In re Sunset Developers*, 69 B.R. 710 (Bankr.D.Idaho 1987), while not addressing *Safren*, the court concluded that the Chapter 11 bankruptcy of a partner caused a dissolution of the partnership under the Idaho UPA.[4]

The Movants point out that the Arizona version of the UPA was not adopted until well after bankruptcy reorganizations were a reality,[5] and argue that therefore the analysis of *Safren* is inapplicable. The Court is

---

3. Notwithstanding this concern of the *Safren* court, it is generally agreed that tax consequences flow from the **termination** not the **dissolution** of a partnership. *See*, 26 U.S.C. § 708; *See*, LaSala, *Partner Bankruptcy and Partnership Dissolution: Protecting the Terms of the Contract and Ensuring Predictability*, 59 Fordham L.Rev. 619, 636 (1991), n. 91.

4. The Court also held that Section 365(e)(1) does not preempt state law. A discussion of Section 365(e) and preemption follows.

5. The Arizona UPA was made law in 1954.

persuaded that Movants are correct. Giving plain meaning to the words of the statute in light of the state of federal law at the moment of passage, the word "bankruptcy" in Arizona's version of the UPA must encompass all bankruptcies, whether under Chapter 7, Chapter 11 or any other chapter in the Bankruptcy Code.[6]

The policy arguments of *Safren* are not useless, however, as they are relevant in a determination of the next issue: whether Section 365 of the Bankruptcy Code[7] preempts state partnership law. First, however, the Court must consider whether the Partnership Agreement is an executory contract.

## C. The Partnership Agreement as an Executory Contract

■ In *In re Cutler*, 165 B.R. 275 (Bankr. D.Ariz.1994), this Court considered whether a partnership agreement is an executory contract. *Cutler* was a Chapter 7 case in which the debtor was one of four partners in a general partnership formed by four siblings. In *Cutler*, this Court held that "courts have generally assumed that partnership agreements are, at least in part, executory contracts." *Id.* at 279–290.

In *Sunset Developers*, the court found that the partnership agreement at issue was an executory contract, and explained:

> Under the agreement the partners each have an obligation to contribute amounts in cash to the partnership when required.... An executory contract exists where performance remains due to some extent on both sides.

*Sunset*, 69 B.R. at 712.

In the instant case, the partners likewise have an obligation to contribute capital when the Partnership is in need and there are other, continuing fiduciary obligations among the partners that make this Agreement an executory contract.

---

6. In a Chapter 7 context the impact of this result may be different, as the trustee necessarily liquidates the assets of a debtor. *See In re Cutler*, 165 B.R. 275 (Bankr.D.Ariz.1994).

## D. Preemption: The Ipso Facto Rule and Exception

■ Section 365(e) of the Code provides:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligations under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;

> (B) the commencement of a case under this title; or

> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or unexpired lease prohibits or restricts assignment of rights or delegation of duties, if—

> (A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance *to the trustee* or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

> (ii) such party does not consent to such assumption or assignment; or

> (B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

Therefore, what Section 365(e)(1) giveth, Section 365(e)(2) may taketh away.

---

7. Unless otherwise indicated herein, all references to Sections are to sections of 11 U.S.C. §§ 101 *et seq.*

■ Section 365(e)(1) provides the general rule that provisions in state law that "terminate or modify"[8] an executory contract because a party to the contract files bankruptcy are not enforceable. Section 365(e)(2) carves out from the general rule agreements as to which "applicable law" allows the non-debtor party to refuse performance from the Trustee or an assignee of the debtor. In this case, the Arizona statute fits neatly into the parameters of Section 365(e)(1) because the purported dissolution would result "solely" from debtor's having filed bankruptcy; the only issue remaining is whether the effect of the statute is saved from nullification by Section 365(e)(2).[9]

Section 365(e)(1) has been termed the "ipso facto rule" while subsection (e)(2) is referred to as the exception to the "ipso facto rule." The legislative history on the ipso facto rule is sparse:

> Subsection (e) invalidates ipso facto or bankruptcy clauses. These clauses, protected under present law [the Bankruptcy Act], permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. If the trustee may assume or assign the contract under the limitations imposed by the remainder of the section, the contract or lease may be utilized to assist in the debtor's rehabilitation or liquidation.

> The unenforceability of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.

> . . . .

Colliers, 15th Ed., 365.06 at 365–59–60, *citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963.

Section 365(e)(2) is closely related to Section 365(c)(1). That section governs the circumstances under which a trustee may assume or assign an executory contrary and, prior to 1984, contained language identical to Section 365(e)(2)—i.e., prohibiting assumption if applicable law excuses acceptance of performance under the contract by the non-debtor from "the trustee . . . or an assignee." However, in 1984, as part of the Bankruptcy Amendments and Federal Judgeship Act ("BAFJA"), this key language in Section 365(c)(1) was amended but the related language in Section 365(e)(2) was left unchanged. Now, Section 365(c)(2) prohibits assumption and assignment if applicable law excuses acceptance of performance under the contract by the non-debtor from "an entity other than the debtor or the debtor in possession." The legislative history for this change provides:

> This amendment makes it clear that the prohibition against a trustee's power to assume an executory contract does not apply where it is the debtor that is in possession and the performance to be given or received under a personal service contract will be the same as if no petition had been filed because of the personal service nature of the contract.

> H.R.Rep. No. 1195, 96th Cong., 2d Sess. Section 27(b) (1980), quoted in *In re Cardinal Industries, Inc.,* 116 B.R. 964, 979 (Bankr.S.D.Ohio 1990).

It is unclear whether Congress attached any significance to the amendment of the one statute and lack of amendment to the other, or whether the omission was merely a technical mistake.[10] The new language of Section

---

8. The state law provision here would cause the "dissolution" of the partnership. As stated above, "dissolution" is not "termination." However, it is certainly a "modification" of the agreement and of the rights of the parties to it, particularly the debtor.

9. There is no doubt from the language of the statute that Congress intended the provisions of

Section 365(e) to preempt otherwise applicable state law, such as the UPA, pursuant to the Supremacy Clause of the United States Constitution.

10. There is no discernable logic in having different language in the two sections. If a partnership agreement were assumable under Section 365(c)(1) (because the debtor was to continue to

365(c)(2) supports the notion that ipso facto clauses should be given effect only where substituted performance from a third party—such as a Chapter 7 trustee or an unrelated party—is actually contemplated but should not be effective where the original debtor (now debtor in possession) is contemplating assumption of the contract. In the context of this case, that would support a conclusion that the ipso facto clause in the Arizona UPA does not compel dissolution because this Chapter 11 Debtor has stated his intention to assume the contract rather than assign it to a third party.[11] Therefore, the non-debtor partners would not be forced to accept an outsider as a new partner but would simply retain their relationship with the Debtor, subject to the rights of each under the partnership agreement and applicable, non-preempted, state law.

■ There are significant policy considerations that support a contrary result, however. The essence of Section 365(e)(2) and 365(c)(1) is to protect non-debtor parties from forced relationships where applicable non-bankruptcy law recognizes that the particular relationship has special characteristics that are personal to the parties involved. An argument could be made that the relationship among general partners in any kind of general partnership should qualify because of the mutual fiduciary obligations and mutual agency powers of the partners. Under this construct, the focus of the bankruptcy law should be on protecting the economic interest of the debtor's estate while state law, the partnership agreement itself and the partners should govern whether the debtor continues as a partner on an on-going basis. A

number of commentators have espoused this view, among them the following:

> Serious consideration should be given to an amendment to the Bankruptcy Code that would allow partners to terminate the status of a general partner who is a debtor under Title 11 if the partnership agreement or nonbankruptcy law allows. If so, the Code should require that the value of the partnership interest be paid to the terminated partner's estate. Such provisions would recognize that partners are the ones who should decide whether a partner in financial difficulty, including a debtor in a Chapter 7, 11, 12, or 13 case, should continue as a general partner. The concern of the bankruptcy law should be with realization of the value of the interest in the partnership. The bankruptcy law should not thrust an unwanted fiduciary and manager on objecting partners.

Kennedy and Smith, *Some Issues in Partnership and Partner Bankruptcy Case and Recommendations for Legislative Change,* Annual Survey of Bankruptcy Law (Callaghan 1990) at 53.

Because of the relationship among partners, partnership agreements are precisely the type of non-delegable, personal service contracts covered by the Section 365(e)(2) exception. A partnership agreement creates a fiduciary relationship among its members, and is a contract based upon good faith, personal trust and confidence. Implicit in the fiduciary duty to other partners is an obligation to conduct partnership affairs in such a manner as to avoid damage to another partner's or the part-

---

perform), it would make no sense nevertheless to compel the partnership's dissolution by giving effect to an ipso facto clause under Section 365(e)(2) because the other party could legally refuse to accept performance from a hypothetical trustee. Therefore, this court will read the amendments to Section 365(c)(1) as clarifying any ambiguity not only in that statute but also in Section 365(e)(2). This is consistent with the origins of the Amendments; they were originally part of The Technical Amendments Act of 1980, the purpose of which was to "correct technical errors, clarify and make minor, substantive changes" to the Bankruptcy Code. H.R.Rep. No. 1195, to accompany S. 658, 96th Cong., 2d Sess. (1980), quoted in *In re Cardinal Industries, Inc.,*

116 B.R. 964, 978. This analysis agrees with *Colliers* which states:

> Section 365(e)(1) is very broad. . . . The wording of section 365(e)(2) is perhaps unnecessarily broad and suggests that a bankruptcy termination clause might be asserted against a debtor in possession when the contract is one for personal services, although it seems clear that the intent was to permit termination only when substituted performance would occur.

Colliers, 15th Ed., 365.06 at 365–60.

11. The Debtor so states in his brief; however, no motion to assume has been filed and the Plan is silent on this point.

nership's interests. [footnote omitted]. La Sala, *supra* note 3, at 629–30.

Notwithstanding the appeal of these policy arguments, the bottom line is that the Bankruptcy Code as presently constructed protects the interests of a debtor partner's estate where that debtor (rather than a trustee or an assignee) seeks to continue in the partnership relationship. Although Kennedy and Smith,[12] and LaSala,[13] argue that Section 365(e)(2) should lead to this same result, the BAFJA amendments to Section 365(c)(1) and the need for internal consistency in these two statutes, as exhaustively analyzed by the court in *In re Cardinal Industries*, 116 B.R. 964 (Bankr.S.D.Ohio 1990), compel a different result.

█ Therefore, this Court is persuaded that Section 365(e)(2) permits state law mandated dissolution to occur only when actual substituted performance is contemplated. This result is particularly appropriate in this case.[14] Here, the Partnership is a real estate investment partnership. It is not a contract for personal services that will be assigned by the Debtors-in-possession to another entity.[15] Rather, the Debtors desire to assume the Partnership Agreement. By Movants' admission, Debtors are current on their capital obligations to the Partnership. Assumption under these circumstances will not deprive the Movants of the benefit of their bargain in joining the Partnership. Further, these partners did not find it necessary or appropriate to include an ipso facto clause in the partnership agreement itself; the only reference to bankruptcy in the agreement is a provision for the purchase of a debtor's interest by either the partnership or the other partners.[16] A final factor militating in favor of this result is that the Movants and Siegal filed an Amended Certificate well after the bankruptcy petition, indicating their intent that the partnership not be dissolved as a result of the bankruptcy.

Therefore **IT IS ORDERED** as follows:

1. The Bankruptcy filing by Debtors did not dissolve the Partnership.

2. Section 365(e)(1) of the Bankruptcy Code preempts the Arizona UPA, Ariz. Ariz.Rev.Stat.Ann. § 29–231.

3. The Partnership Agreement does not fall within the exception to the ipso facto rule, Section 365(e)(2) of the Bankruptcy Code.

4. Except as otherwise granted in part by prior Order of this Court, the Motion for Stay Relief filed by Movants is denied.

12. Kennedy and Smith, at 54.

13. LaSala, at 632–35.

14. The Movants complain that the relationship among the partners has become intolerable and has created an unappealing and unpleasant working environment as well as financial hardship for them. The Court has already lifted the stay to allow Movants to pursue dissolution on these grounds in an appropriate court of their choice. *See, e.g.,* Ariz.Rev.Stat.Ann. § 29–232. As to financial hardship, the debtor will have to satisfy Section 365(b)'s requirements of cure and adequate assurance of future performance before assuming the agreement.

15. In *Cutler,* this Court held that a debtor's Chapter 7 petition did cause the dissolution of the debtor's general partnership; however the Court stated:

Much has been written about whether the "dissolution" provisions of state law conflict with the executory contract provisions of the Bankruptcy Code.... However, this issue is not important to this case since the Trustee is not seeking to retain management rights in the partnership. In addition, the Trustee has not questioned whether the given effect to the 'buy out' clause would violate the automatic stay and the Court therefore does not address that question.

*Cutler,* 165 B.R. at 278, n. 8.

16. The non-debtor partners have not attempted to exercise this buy-out clause and therefore its viability is not before the Court. The Court does note that its enforceability would be subject to scrutiny if an attempt were made to invoke it. *See In re Cutler,* 165 B.R. 275 (Bankr.D.Ariz. 1994).