In re Robert R. DeLUCA and Marilyn DeLuca, et al., Debtors.

**JTB ENTERPRISES, L.C., Plaintiff,**

v.

**D & B VENTURE, L.C., et al., Defendants.**

**Bankruptcy No. 95–11924–AM. Adv. No. 95–1182.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Feb. 8, 1996.

---

Joseph S. Luchini, Hazel & Thomas, P.C., Falls Church, VA, for Joel T. Broyhill.

Harvey B. Cohen, Cohen, Gettings & Dunham, P.C., Arlington, VA, for Robert and Marilyn DeLuca.

Kevin M. O'Donnell, McKinley, Schmidtlein, O'Donnell & Bornmann, P.L.C., Alexandria, VA, Thomas P. Gorman, Tyler, Bartl, Burke & Albert, Alexandria, VA, for defendants.

Stanley M. Salus, Chapter 11 Trustee, Wickwire Gavin, P.C., Vienna, VA.

Frank Bove, Attorney–Advisor, Office of United States Trustee, Alexandria, VA.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

The plaintiff in this adversary proceeding, JTB Enterprises, L.C. ("JTB"), seeks a determination that R & M Kiln Creek, L.C. ("R

& M Kiln Creek") was properly removed as the managing member of D & B Venture, L.C. ("D & B Venture"), one of the debtors in these jointly administered cases, and that JTB was properly substituted as the managing member. A trial of the issues was held on September 22 and September 28, 1995. At the conclusion of the plaintiff's evidence, defendant R & M Kiln Creek moved under Fed.R.Bankr.P. 7053 and Fed.R.Civ.P. 53(c) for judgment as a matter of law, which the court granted with respect to one of the plaintiff's three alternate grounds for relief. The defendant then presented its evidence. At the conclusion of the evidence the court took the matter under advisement and invited the parties to submit post-trial briefs on the remaining issues. These have been filed, and the matter is ripe for determination.[1]

## Findings of Fact

D & B Venture, the subject of this adversary proceeding, is a Virginia limited liability company. It is also the debtor in one of fourteen related chapter 11 cases filed in this court, all which are currently (at least in theory) being jointly administered.[2] The other related cases are the individual chapter 11 case of real estate developers Robert and Marilyn DeLuca ("the DeLucas") and the chapter 11 cases of various partnerships, limited partnerships, and limited liability companies which they own or control ("the DeLuca entities").

D & B Venture has two members. One is R & M Kiln Creek, itself a limited liability company, whose sole members are the DeLucas. The other member of D & B Venture is JTB, also a limited liability company, whose

members are Joel T. Broyhill ("Broyhill") and Richard Houser.

D & B Venture was formed as part of a coordinated transaction in which a real estate project known as the Villages of Kiln Creek, located in Newport News and York County, Virginia, was sold by a joint venture consisting of an affiliate of Crestar Bank and a limited partnership owned by the DeLucas. Robert DeLuca had approached Broyhill in February 1993 and proposed, in effect, a joint venture between the DeLucas and Broyhill to develop and sell the property. Crestar was being asked to provide financing for the acquisition and development and apparently did not wish to make the loan directly to an entity in which the DeLucas had an interest. The purchase transaction was accordingly accomplished in two stages, separated by approximately three days. First, D & B Venture was set up with Broyhill individually as a 50% member with an initial capital cash contribution of $497,500 and with JTB as the other 50% member with a capital contribution of $2,495,000. The Kiln Creek property was then deeded to D & B Venture, which also executed a deed of trust securing Crestar Bank.

Immediately upon the recording of the deed and deed of trust, the D & B Venture operating agreement was amended and restated, with Broyhill's individual 50% interest being assigned to R & M Kiln Creek in exchange for $497,500 paid by the DeLucas. An Amended and Restated Operating Agreement dated "as of" May 10, 1993 (the "amended operating agreement") provided that JTB and R & M Kiln Creek would each have a 50% membership interest.[3] In addi-

---

1. Since the trial, principals of JTB and R & M Kiln Creek have entered into a proposed global settlement that would resolve all controversies between them, including the issues raised by the present adversary proceeding. With respect specifically to D & B Venture, R & M Kiln Creek would concede management rights to JTB and would assign to JTB its equity interest. It is tempting to say that the pending settlement renders the present controversy moot and makes a decision unnecessary. The proposed settlement, however, requires court approval, and since several parties have filed objections, such approval is by no means a foregone conclusion. Accordingly, the court concludes that the litigation is

not at the present time moot, even though it may become so.

2. An order for joint administration was entered shortly after the cases were filed. Subsequently, a chapter 11 trustee has been appointed in 10 of the cases (including D & B Venture), while the debtors remain in possession in the remaining cases.

3. "5.1 *Percentage Interests.* Upon the execution of this Agreement, each Member shall have an interest in the Company expressed as a percentage of the whole (*"Membership Interest"*), with the initial Membership Interest in the Company

tion to succeeding to Broyhill's $497,500 capital interest, R & M Kiln Creek was obligated under the agreement to contribute up to $500,000 in additional capital.[4] If the company needed funds beyond the additional $500,000, the agreement provided that "the Company may obtain such funds through loans upon such terms as shall be approved by the Members." ¶ 5.2(b). In the event such loans were not obtained, any member could, but was not required to, make additional capital contributions after written notice was given to all members of the opportunity to participate pro rata. If a member did not make an additional contribution within 30 days of the notice, the manager was free to make a unilateral capital contribution.[5] The amended operating agreement further provided that the members had no "right or obligation to make any additional contribution to the capital of the Company except as expressly provided in this Agreement." ¶ 5.2(d).

Under the amended operating agreement, each member of the company had a capital account. JTB began with an initial capital account balance of $2,495,000. The agreement provided that R & M Kiln Creek would succeed to Broyhill's individual capital account of $495,000 and that its capital account would be "increased to reflect the cash capital contribution made" pursuant to the requirement to contribute the additional $500,000. ¶ 5.2. The agreement further stated, "Loans by any Member to the Company shall not be considered contributions to the capital of the Company." ¶ 5.4. Profits and losses were allocated according to a complicated formula that first equalized the capital accounts of the members; thereafter, profits and losses were to be allocated in accordance with the membership interests. Broyhill testified he understood the distribution formula to mean, in effect, that JTB would receive $3 in distributions to every $1 received by R & M Kiln Creek until R & M Kiln Creek had contributed the additional $500,000, at which point JTB would receive $2 for every $1 going to R & M Kiln Creek.

The amended operating agreement vested management of the affairs of the company in R & M Kiln Creek as the company's manager. The agreement contained no language specifically addressing removal of a manager or appointment of a successor manager. It did provide that the company would be dissolved upon the occurrence of certain specified events, among them either R & M Kiln Creek or JTB "dissolving or becoming Bankrupt." ¶ 11.1(c). It further specified that upon dissolution, "the Manager shall take full account of the Company assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair value thereof and the proceeds from such liquidation shall be distributed ... to the Members...." ¶ 11.4.

Beginning shortly after the acquisition of the property, R & M Kiln Creek, through Marilyn DeLuca, began sending JTB statements on a monthly basis itemizing costs which R & M Kiln Creek asserted it had advanced on behalf of D & B Venture and advising that R & M Kiln Creek considered such advances as applying toward its obligation under the amended operating agreement to make the additional $500,000 capital

---

of Enterprises being fifty percent (50%) and the initial Membership Interest in the Company of R & M being fifty percent (50%)."

**4.** "5.2. *Additional Capital Contributions.* (a) R & M shall be obligated to make one or more capital contributions to the Company up to a maximum of Five Hundred Thousand and No/100 Dollars ($500,000.00) (*"Mandatory Contributions"*) to the extent such funds are needed to satisfy the obligations of the Company."

**5.** "(c) In the event such loans are not obtained, any Member may, but shall not be obligated or required to, make contributions to the capital of the Company (*"Optional Contributions"*). If all the Members desire to participate in any Optional Contribution to the Company, the Optional Contributions shall be made by the Members in accordance with their respective Membership Interests or in such other percentages as the Members shall agree. The Manager shall send written notice to the Members of the opportunity to make Optional Contributions and the Members will have thirty (30) days to respond to such request by advancing its respective *pro rata* share of the Optional contribution amount to the Manager within such 30-day period. To the extent that a Member does not advance its *pro rata* share of the Optional Contribution requested within such 30-day period, the Manager may, in its sole discretion, contribute such amount to the Company."

contribution.[6] JTB did not object to either the characterization or amount of the claimed advances. After the asserted advances had reached the $500,000 level, Marilyn DeLuca continued to send JTB Enterprises notices (sometimes bi-monthly rather than monthly) which simply described the sums as "expenses paid" without stating that they were being treated as capital contributions.[7] The last memo sent, on May 2, 1994, asserted that the total amount of the advances that R & M Kiln Creek had made on behalf of D & B Venture was $710,247.66.

As parcels were sold, the note to Crestar was partially paid down, and distributions were made to the members in a manner consistent with Broyhill's understanding of the distribution formula.[8] According to a summary prepared by Marilyn DeLuca at Broyhill's request, JTB had received, as of November 29, 1994, $1,006,631 in distributions, reducing its capital account to $1,488,369, while R & M had received $350,324 in distributions, reducing its capital account to $647,176.[9] Pltf. Ex. 30.

Beginning in approximately October 1994, the relationship between Broyhill and the DeLucas began to sour, largely because Broyhill felt he was not being provided with the detailed information he requested concerning Kiln Creek and other projects he was involved in as an investor with the DeLucas. On or about April 28, 1995, JTB, asserting that it was the owner of the majority capital interest in D & B Venture, executed a written instrument purporting to remove R & M Kiln Creek as manager of the limited liability company and appointing itself as the successor manager.[10] On May 5,

---

6. A typical example is a July 27, 1993, memorandum from Marilyn DeLuca addressed to Robert DeLuca, Joel Broyhill, and Dick Houser captioned "July D & B Budget Draw":

   Enclosed please find the July 1993, draw for the D & B expenses and costs. I have enclosed a summary sheet, plus the respective invoices.

   Pursuant to the D & B Operating Agreement, R & M Kiln Creek will fund these costs until such time as a total of $500,000.00 has been paid by R & M, or JTB Enterprises, L.C., has been repaid its additional capital payment of $500,000.00, advanced at closing. The expenses enclosed have been funded by R & M Kiln Creek. The $136,639.01 funded herewith coupled with the May and June 1993 expenses paid by R & M Kiln Creek of $132,921.99, brings the total advanced to date by R & M to $269,561.00.

   A review of the attached invoices and checks reflects that a significant amount of the expenses were actually billed to or paid by other DeLuca-related entities rather than R & M Kiln Creek, including Villages of Kiln Creek, L.P., Kiln Creek Country Club, Robert R. DeLuca, J & B Enterprises, RMS Associates, and American Property Services, Inc.

7. A typical example is a December 9, 1993, memorandum from Marilyn DeLuca to Robert DeLuca, Joel Broyhill, and Dick Houser, captioned "October and November D & B Budget Draw":

   Enclosed please find the October and November 1993 draws for the D & B expenses and costs. I have enclosed a summary sheet, plus the respective invoices.

   The expenses paid by R & M Kiln Creek to date, including this most recent draw, equals $564,811.15.

8. A November 8, 1993 memorandum from Marilyn DeLuca to Broyhill stated:

   It should be noted that with the filing of the October 1993 draw of operating expenses, fully funded by R & M Kiln Creek, we will have reached the required $500,000.00 partner contribution. Therefore, commencing with the November 1993 closing, the partner distributions will revert to the initial 67% JTB Enterprises/33% R & M Kiln Creek as prescribed in the partnership agreement.

9. In addition, Broyhill received approximately $400,000 under a provision of the amended operating agreement that called for him to be paid a fee of $20,000 per month. In the testimony, this was described as an "asset management fee," although the agreement itself (¶ 9.2) simply describes it as a "guaranteed payment," without any further indication of its purpose. The DeLucas, in addition to receiving distributions under the amended operating agreement and repayment of certain advances, received indirectly through American Property Services, Inc. a "development fee" of 3% of the sales price of each parcel sold.

10. At or about this time, Broyhill caused a suit to be filed in state court seeking to take control of the company and filed a memorandum of lis pendens against its real estate. Broyhill testified that the reason he filed the suit and took action to remove R & M Kiln Creek as the manager was that he because he felt he had to take over the project to protect himself. Although some sales contracts were being closed, JTB had not received a distribution since March 1994. Broyhill was personally liable on the Crestar revolving loan, which at that point had a balance of approximately $4,000,000. Broyhill has been pay-

1995, the DeLucas filed a voluntary chapter 11 petition in this court; they remain in possession of their estate as debtors in possession. The DeLucas caused D & B Venture to file a voluntary chapter 11 petition on May 14, 1995. In response to vociferous creditor complaints concerning the DeLucas' management of the various DeLuca entities, D & B Venture itself moved for appointment of a chapter 11 trustee. The court granted the motion, and Stanley M. Salus, Esquire, was appointed as the chapter 11 trustee on June 27, 1995.

## Conclusions of Law

■ This court has jurisdiction of this controversy as a "related" non-core proceeding under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984.[11] The parties have consented to the entry of final orders and judgments by this court, subject to the right to appeal to the United States District Court under 28 U.S.C. § 158(a). Venue is proper in this District under 28 U.S.C. § 1409(a).

The plaintiff has articulated three arguments as to why it should prevail. The first is that, as the holder of the majority capital interest in D & B Venture, it had, and properly exercised, the power to remove R & M Kiln Creek as manager. The second is that the chapter 11 filing of the DeLucas resulted in the dissolution of R & M Kiln Creek, thereby rendering it incapable of acting as the manager of D & B Venture. The third argument, which follows from the second, is that R & M Kiln Creek's dissolution statutorily conferred on JTB, as the sole remaining member able to act, the right to wind up D & B Venture's affairs. Each of these contentions will be discussed in turn.

### A. Whether JTB Enterprises could by its sole vote remove R & M Kiln Creek as manager.

■ This issue was resolved adversely to JTB at trial. Some discussion of the issue is warranted, however, in order to provide a framework for the remaining issues. Accordingly, this memorandum opinion will supplement the court's findings of fact and conclusions of law made orally on the record.

As noted above, D & B Venture is a limited liability company. Limited liability companies, which have become increasingly pop-

---

ing the interest on that loan since the chapter 11 filing.

11. The complaint alleged that this was a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) ("matters concerning the administration of the estate" and "other proceedings affecting ... the equity security holder relationship.") R & M Kiln Creek's answer, however, denied that the matter was a core proceeding. Upon consideration, the court has concluded that the adversary proceeding is non-core. Under 28 U.S.C. § 1334, bankruptcy jurisdiction extends to "cases under title 11" and to civil proceedings "arising under," "arising in," or "related to" a bankruptcy case. The first two categories ("arising under" and "arising in") constitute "core" proceedings, with respect to which a bankruptcy judge may enter final judgments or orders, subject to the right to appeal to the U.S. District Court under 28 U.S.C. § 158(a). "In order for a proceeding to 'arise under' Title 11, the claim must be predicated on a right created by Title 11. Examples ... include preference actions and fraudulent conveyance actions. On the other hand, 'arising in' proceedings are those that are not based on any right expressly created by Title 11 but would have no practical existence but for the bankruptcy. Examples would include actions to determine the validity of liens or claims." Lux v. Spotswood Constr. Loans, 176 B.R. 416, 418 (E.D.Va.1993) (Merhige, J.) (internal citations omitted). The third category of matters ("related to") are those where "the outcome could in some way alter the parties' rights in bankruptcy or affect the administration of the estate." Id. The distinction is important, because although a bankruptcy judge may hear a non-core "related" proceeding, the bankruptcy judge may not enter a final judgment or order unless the parties expressly consent. Otherwise, the bankruptcy judge submits proposed findings of fact and conclusions of law to the U.S. District Court, "and any final order or judgment shall be entered by the district judge after considering de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1); Fed.R.Bankr.P. 7012(b) and 9033. The present controversy, involving as it does the rights of the company's members *inter se*, does not assert any right created by the Bankruptcy Code or which would have no practical existence outside the bankruptcy context. Indeed, except for the happenstance that D & B Venture and the DeLucas are chapter 11 debtors, this is a proceeding that would have been decided in state court.

ular as a form of business organization, are a relatively recent innovation. As explained by one commentator,

> In response to favorable tax rulings, most states recently have followed the lead of Wyoming and Florida and enacted legislation for the formation and recognition of the limited liability company (LLC). The LLC is a form of legal entity that has attributes of both a corporation and a partnership but is not formally characterized as either one. Generally, an LLC offers all of its members, including any member-manager, limited liability as if they were shareholders of a corporation but treats the entity and its members as a partnership for tax purposes.

Thomas F. Blakemore, "Limited Liability Companies and the Bankruptcy Code: A Technical Overview," 13 *Am.Bankr.Inst.J.* 12. In Virginia, limited liability companies are governed by the Virginia Limited Liability Company Act, §§ 13.1–1000 to 13.1–1069, Va.Code Ann., enacted in 1991. A Virginia limited liability company may engage in any lawful business that a corporation, partnership or other business entity may conduct under Virginia law. § 13.1–1009(17), Va. Code Ann. A limited liability company in Virginia is formed by filing articles of organization with the State Corporation Commission. § 13.1–1010, Va.Code Ann. A person that *owns an interest in the company is called a "member."* § 13.1–1002, Va.Code Ann. The members may (and in practice invariably do) enter into an operating agreement which regulates and establishes the conduct of the company's business and the relationship of its members. § 13.1–1023(A), Va.Code Ann. Management of the company is vested in the members in proportion to their capital contributions, as adjusted for additional contributions and distributions, unless the articles of organization or the operating agreement provide that the company will be managed by one or more managers. § 13.1–1022, Va.Code Ann. Managers, if provided for in the articles of organization or operating agreement, are elected by the members. § 13.1–1024(D), Va.Code Ann. In a manager-managed limited liability company, only managers can contract for the company's debts or execute documents for the

acquisition, mortgage or disposition of the company's property. § 13.1–1024(G), Va. Code Ann.

JTB asserts that because its capital account balance ($1,488,369) was greater than that of R & M Kiln Creek ($647,146)—even giving R & M Kiln Creek the benefit of the $500,000 it claims to have contributed by paying D & B Venture expenses—JTB had the right to remove R & M Kiln Creek as manager, since (1) under § 13.1–1024(F), Va. Code Ann., "If the articles of organization or an operating agreement of a limited liability company does not provide for the removal of managers, then all managers or any lesser number may be removed with or without cause *by a majority vote of the members*" (emphasis added), and (2) under § 13.1–1022, Va.Code Ann.,

> Unless otherwise provided in the articles of organization or an operating agreement, the members of a limited liability company *shall vote in proportion to their contributions to the limited liability company,* as adjusted from time to time to reflect any additional contributions or withdrawals, and *a majority vote of the members of a limited liability company shall consist of the vote or other approval of members having a majority share of the voting power of all members.*

(emphasis added). R & M Kiln Creek disputes that JTB had the larger capital account, but the issue is not one which need be resolved, since the provision of § 13.1–1022 that members "shall vote in proportion to their contributions" only applies in the absence of contrary provisions in the articles of organization or operating agreement. Under the terms of the amended operating agreement for D & B Venture, "membership interest" *was not tied to the level of capital contributions.* Even at the outset, when R & M Kiln Creek first succeeded to Broyhill's individual 50% membership interest and had a capital account only one-fifth of JTB's, the amended operating agreement unambiguously assigned R & M Kiln Creek a 50% membership interest. The amended operating agreement clearly treats membership interest as distinct both from capital accounts and distribution rights and provides separate

treatment for each. While the amended operating agreement never explicitly states how votes are to be counted in connection with what are described as "Major Decisions" by the company requiring member vote (¶ 6.2),[12] the clear implication is that each of the members has an equal vote. Accordingly, the court concludes that JTB, as the holder of a 50% membership interest, could not under the amended operating agreement cast "a majority vote of the members" to remove R & M Kiln Creek as manager notwithstanding that JTB may have had the larger capital account.[13]

B. *Whether the chapter 11 filing by the DeLucas resulted in the dissolution of R & M Kiln Creek.*

■ JTB argues that under the plain terms of R & M Kiln Creek's operating agreement, the chapter 11 filing by the DeLucas triggered the dissolution of R & M Kiln Creek, and that under the amended operating agreement for D & B Venture and applicable Virginia law, the dissolution of R

& M Kiln Creek in turn caused D & B Venture to be dissolved[14] and conferred on JTB, as the sole remaining member able to act, the right to wind up the company's affairs.[15] In this connection, R & M Kiln Creek's operating agreement contains the following provision:

9.1 *Time for Dissolution.* The Company shall be dissolved upon the earlier to occur of:

(c) the death, resignation, expulsion, bankruptcy or dissolution of a member ... unless the business of the company is continued by the unanimous consent of the remaining members ...

This language, like the similar provision in D & B Venture's operating agreement, is consistent with § 13.1–1046, Va.Code Ann., which at the time of the DeLucas' chapter 11 filing, read as follows:

A limited liability company organized under this chapter is dissolved and its affairs shall be wound up upon the happening of the first to occur of the following events:

**12.** While not directly raised as an issue in this adversary proceeding, it is clear that the decision to file a chapter 11 petition was a "major decision" that required the vote of the members and that R & M Kiln Creek had no authority, solely in its capacity as manager, to file a chapter 11 petition on behalf of D & B Venture. See, *In re Old·Grind Co., Inc.,* 99 B.R. 317 (Bankr.W.D.Va. 1989) (Krumm, J.) (Chapter 11 petition dismissed since under Virginia law corporation's president had no authority, solely in his capacity as president, to file on behalf of corporation); Thomas F. Blakemore, Limited Liability Companies and the Bankruptcy Code, 13 Am.Bankr. Inst.J. 12 (June 1994) (suggesting that unanimous consent of members may be required for bankruptcy filing by LLC unless operating agreement clearly confers such authority on manager).

**13.** R & M Kiln Creek made an offer of proof that Marilyn DeLuca would testify that R & M Kiln Creek had a larger capital account than JTB, presumably based on treating all the claimed expenses paid by R & M Kiln Creek as capital contributions. The operating agreement, however, did not give R & M Kiln Creek the unilateral right to contribute additional capital beyond the $500,000 required under the agreement, and there was no evidence that R & M had ever given JTB notice of the opportunity to join in making additional capital contributions. Accordingly, the court concludes that any expenses advanced

beyond the level of the $500,000 mandatory additional contribution to the company constituted loans by R & M Kiln Creek to the company; and, indeed, such characterization is consistent with the company's income tax returns and with the schedule prepared by Marilyn DeLuca for Broyhill summarizing sales, distributions, and capital account balances (i.e., $1,488,369 for JTB and $647,176 for R & M Kiln Creek). Since, based on the court's interpretation of the amended operating agreement, any expenses paid on D & B Venture's behalf beyond the $500,000 did not constitute capital contributions, and since, in any event, under the amended operating agreement JTB and R & M Kiln Creek each had an equal vote without regard to the state of their capital accounts, the court declined to receive the proffered testimony.

**14.** See ¶ 11.1 of the amended operating agreement for D & B Venture: "The Company shall be dissolved and ... its business wound up, upon the earlier to occur of: ... R & M or Enterprises *dissolving* or becoming Bankrupt" (emphasis added).

**15.** See § 13.1–1048, Va.Code Ann.: "Unless otherwise provided in the articles of organization or an operating agreement, the members *who have not wrongfully dissolved* a limited liability company may wind up a limited liability company's affairs" (emphasis added).

1. At the time or on the happening of the events specified in the articles of organization or an operating agreement;

\* \* \* \* \* \*

3. Upon the death, resignation, expulsion, bankruptcy or dissolution of a member unless the business of the limited liability company is continued by all or such lesser percentage or number (but not less than a majority in interest) of the remaining members as may be provided in writing in the articles of organization or operating agreement of the limited liability company.

Since the operating agreements do in fact provide for dissolution of R & M Kiln Creek and D & B Venture under the circumstances stated (and since there were no "remaining members" in R & M Kiln Creek who could have voted to continue the business), the issue is whether those provisions are—as R & M Kiln Creek vigorously contends—unenforceable in bankruptcy as an "ipso facto" clause.

As an initial matter, the court is required to determine the nature of the DeLucas' interest in R & M. As discussed above, limited liability companies are a conceptual hybrid, sharing some of the characteristics of partnerships and some of corporations. "In general, the purpose of forming a limited liability company is to create an entity that offers investors the protections of limited liability and the flow-through tax status of partnerships." Jonathan R. Macey, The Limited Liability Company: Lessons for Corporate Law, 73 Wash.U.L.Q. 433 (1995). In order to achieve the desired goal of pass-through tax treatment, it is necessary under applicable U.S. Treasury Regulations that the company have more of the attributes of a partnership than of a corporation. Macey, *supra;* Treas.Reg. § 301–7701–2(a)(1). Consequently, it makes sense to look for guidance to those bankruptcy decisions which have considered the effect of clauses in partnership agreements or state law which provide for the dissolution of partnerships upon the filing of a bankruptcy petition by a partner.

In the partnership context, it has been held that the interest of a debtor general partner is

> comprised of three components: the right to participate in profits, losses, distributions and proceeds of the partnership ("Economic Interest"); the right to participate in the management of the partnership ("Management Interest"); and the ownership share in partnership property as a tenant-in-partnership.

*In re Cardinal Industries, Inc.,* 116 B.R. 964, 970–971 (Bankr.S.D.Ohio 1990). In a Virginia limited liability company, members have no direct interest in the company's property,[16] but members have an economic interest, referred to in the statute as a "membership interest,"[17] in the profits, losses and distributions of the company. Additionally, the members have a management interest, the degree of which depends on whether the company is member-managed or manager-managed and, if the latter, on the kind of decisions which the articles of organization or operating agreement confer on the manager.

Under § 541(a) of the Bankruptcy Code, the commencement of a bankruptcy case creates an estate of "all legal and equitable interests of the debtor in property as of the commencement of the case." Furthermore,

16. *See,* § 13.1–1021, Va.Code Ann. ("Any estate or interest in property may be acquired in the name of the limited liability company, and title to any estate or interest so acquired vests in the limited liability company."); § 13.1–1034 ("Except as provided in writing in the articles of organization or an operating agreement, a member, regardless of the nature of his or its contribution, has no right to demand and receive any distribution from a limited liability company in any form other than cash."); § 13.1–1038 ("A membership interest in a limited liability company is personal property."); § 13.1–1041 (judg-ment creditor has right to obtain a charging order against member's interest but "has only the rights of an assignee of the interest in the limited liability company.")

17. " 'Membership interest' or 'interest' means a member's share of the profits and the losses of the limited liability company and the right to receive distributions of the limited liability company's assets." § 13.1–1002, Va.Code Ann. See § 13.1–1029, Va.Code Ann. ("Sharing of profits and losses") and § 13.1–1030, Va.Code Ann. ("Sharing of distributions").

the debtor's interest becomes property of the estate

notwithstanding any provision in an agreement ... or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on ... the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

§ 541(c), Bankruptcy Code. Where the debtor's interest arises under an executory contract,[18] the trustee, or, in a chapter 11 case, a debtor in possession,[19] may, with court approval, assume the contract. § 365(a), Bankruptcy Code. Once assumed, the contract may be assigned "notwithstanding a provision in an executory contract ..., or in applicable law, that prohibits, restricts, or conditions the assignment of such contract." § 365(f), Bankruptcy Code. As with property of the estate generally, the debtor's interest in an executory contract

may not be terminated or modified, and any right or obligation under such contract ... may not be terminated or modified, at any time after the commencement of the case, solely because of a provision in such contract ... that is conditioned on— ... (B) the commencement of a case under this title.

The clear intent of these provisions is to preserve, for the benefit of the creditors of the bankruptcy estate, all of the debtor's property rights by making unenforceable so-called "ipso facto" clauses that terminate or impair a debtor's property rights when the debtor files a bankruptcy petition.

There is, however, a limited class of executory contracts with respect to which assumption or assignment cannot be forced on an unwilling party. These include contracts to make a loan or to extend other debt financing or financial accommodation and "personal service" contracts where

(1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment.

§ 365(c), Bankruptcy Code. Similarly, under § 365(e)(2), Bankruptcy Code, the unenforceability of contract provisions which modify a debtor party's rights on the filing of bankruptcy

does not apply to an executory contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to the trustee or to an assignee of such contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment.

Courts have generally held partnership agreements to be a form of executory contract. *Breeden v. Catron (In re Catron)*, 158 B.R. 624, 626 (Bankr.E.D.Va.1992) (Tice, J.),

---

**18.** The term "executory contract" is not defined in the Bankruptcy Code, but most courts and commentators have concurred with the definition first proposed by Professor Vern Countryman:

a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

Countryman, Executory Contracts in Bankruptcy, 57 Minn.L.Rev. 439, 450–460 (1973). 2 King,

Collier on Bankruptcy, ¶ 365.02, n. 3, p. 365–16.5 (15th ed.). *See, Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985), cert. denied 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (contract is executory if performance is due to some extent on both sides).

**19.** Although § 365(a) refers only to a "trustee," under § 1107, Bankruptcy Code, a debtor in possession has all of the rights, powers, and duties of a trustee, except the right to compensation.

*aff'd*, 158 B.R. 629 (E.D.Va.1993), *aff'd*, 25 F.3d 1038 (4th Cir.1994). They have split, however, on whether such contracts are of the "personal service" variety which, under § 365(e)(2), Bankruptcy Code, cannot be forced on an unwilling party, or whether, conversely, they are subject to the prohibition on enforceability of ipso facto clauses under § 365(e)(1). *Catron* took the position that "[f]undamentally a partnership is based upon the personal trust and confidence of the partners," and that because of this relationship, "the agreement or contract governing the partnership is essentially a contract for personal services, which renders it also nondelegable and nonassumable." 158 B.R. at 627. *See, also, Phillips v. First City, Texas–Tyler, N.A. (In re Phillips)*, 966 F.2d 926 (5th Cir.1992) (partner who was chapter 11 debtor did not have authority to file chapter 11 petition for partnership); *In re Doddy*, 164 B.R. 276 (Bankr.S.D.Ohio 1994) (nondebtor partnership dissolved on chapter 13 filing by debtor general partner); *In re Tip O Texas RV Village*, 87 B.R. 195 (Bankr. M.D.Fla.1988) (debtor general partner had no right to manage four limited partnerships against whom involuntary petition had been filed); *In re Sunset Developers*, 69 B.R. 710 (Bankr.D.Idaho 1987) (debtor general partner had no authority to file involuntary petition against partnership; as debtor in possession, the general partner was a new entity and entitled only to contract profit to which an assignee is entitled, without management or voting rights); *Turner v. Lee (In re Minton Group)*, 27 B.R. 385 (Bankr.S.D.N.Y. 1983), *aff'd*, 46 B.R. 222 (S.D.N.Y.1985) (chapter 11 filing by general partner dissolved limited partnership and deprived debtor general partner of management authority); *Normandin v. Normandin (In re Normandin)*, 106 B.R. 14 (Bankr.D.Mass. 1989) (debtor general partner may not sell partnership assets; provision of state law denying debtor partner the right to control the winding up process not in conflict with Bankruptcy Code).

Other cases have reached a contrary position. *See, Cardinal Industries, supra* (debtor general partner's right to manage limited partnership not terminated by chapter 11 filing); *In re Clinton Court*, 160 B.R. 57 (Bankr.E.D.Pa.1993) (debtor partnership not dissolved by prior chapter 11 filing of general partner); *In re Corky Foods Corp.*, 85 B.R. 903 (Bankr.S.D.Fla.1988) (motion to require debtor partner to abandon interest in partnership because of dissolution denied; state statute providing for dissolution held to be invalid ipso facto clause); *In re BC & K Cattle Co.*, 84 B.R. 69 (Bankr.N.D.Tex.1988) (general partner's chapter 11 filing did not deprive him of authority to file involuntary petition against partnership); *In re Rittenhouse Carpet, Inc.*, 56 B.R. 131 (Bankr. E.D.Pa.1985) ("removal of a debtor general partner of a limited partnership may not be predicated merely on the filing of a petition in bankruptcy, notwithstanding provisions of state law to the contrary"); *Quarles House Apts. v. Plunkett (In re Plunkett)*, 23 B.R. 392 (Bankr.E.D.Wis.1982) (debtor general partner's right to manage nondebtor partnership's business and to receive management fee under partnership agreement is property of the estate); *Summit Investment and Development Corp. v. LeRoux*, 69 F.3d 608 (1st Cir.1995) (ipso facto termination clause in limited partnership agreement and limited partnership statute unenforceable against debtor general partner).

Finally, still other courts have adopted a pragmatic, case by case approach that looks to the specific partnership in question, and the nature of the debtor's responsibilities, to determine whether the partnership agreement is a non-assignable executory contract. *See, In re Antonelli*, 148 B.R. 443, 448 (D.Md.1992) (Motz, J.) (nondebtor party is excused from performance only "if the identity of the debtor is a material condition of the contract when considered in the context of the obligations which remain to be performed under the contract").

■ The analysis in the present case is complicated by a number of factors. First, since the DeLucas are members of R & M, not of D & B Venture, they have no direct economic or management interest in D & B Venture. It would appear, however, that R & M is little more than a conduit or shell; its only apparent function is to hold technical title to what is in substance the DeLucas' interest in D & B Venture. Amazingly, the

DeLucas do not even list their ownership of R & M Kiln Creek in their schedules. Under the amended operating agreement for D & B Venture, the actual entity designated as the "developer" of the project is American Property Services, Inc., a separate corporation which is wholly-owned by the DeLucas. With respect to R & M Kiln Creek, the DeLucas are the only members. Consequently, there are no other members to object to their assumption of its management, regardless of whether its operating agreement is considered a personal service contract. At the time of trial, the DeLucas had not taken any steps in their chapter 11 case to assume the operating agreement of R & M Kiln Creek—hardly surprising, given that R & M Kiln Creek is not listed in their schedules.[20] In any event, the only purpose of assuming the management function of R & M Kiln Creek would be, through it, to continue the management of D & B Venture. This is, in short, one of those situations where it appears appropriate to disregard the form of the DeLucas' interest in D & B Venture and to look to the substance.

That substance is the DeLucas' effort, through R & M Kiln Creek, to manage D & B Venture over the adamant opposition of JTB, the only other member. Although R & M Kiln Creek argues that *Catron, supra,* was wrongly decided, *Catron* is the controlling authority within this District. Even if this court were to adopt the pragmatic approach of *Antonelli, supra,* rather than *Catron,* the result would not be different. In *Antonelli,* Judge Motz, while rejecting a *per se* rule that would characterize all partnership agreements as personal service contracts, recognized that there were certain partnership agreements that would clearly fall into that category. For example,

> a reorganization plan could not require that a law firm accept as a partner the assignee of one of their partners who had become bankrupt. The nature of the duties which law partners owe, not only to

one another but to their clients, make their identities material to the very existence of the partnership.

148 B.R. at 448–449. With respect specifically to real estate partnerships, Judge Motz distinguished between "development" projects on the one hand "in which the general partner must administer the planning, construction and leasing of the building," and "matured" projects on the other "that require only routine management and leasing functions." 148 B.R. at 449. In the former, "the identity of a general partner will be critical to the limited partners and to the prospect of a successful investment," while in the latter, "the identity of a general partner is less significant." *Id.* D & B Venture is a clear example of a "development project" where the identity of the manager is material to very existence of the enterprise, since there are still significant development decisions to be made and parcels to be sold.

Accordingly, the court concludes that R & M Kiln Creek, to the extent that the amended operating agreement gives it management control of D & B Venture, should be treated (consistent with its own operating agreement) as having been dissolved as a result of the DeLucas' chapter 11 filing. In doing so, the court is aware that it reaches a contrary result from the only other reported bankruptcy decision to have considered this issue in the context of a limited liability company. In *Matter of Daugherty Construction, Inc.,* 188 B.R. 607 (Bankr.D.Neb.1995), the court held that a chapter 11 filing by one of the members of two Nebraska limited liability companies (each formed to develop an apartment building) did not result in the dissolution of the companies or permit the non-debtor members to terminate the debtor as general contractor for the projects. The court held that the provisions of the articles of organization and of the Nebraska Limited Liability Companies Act for the dissolution of the companies upon the bankruptcy of one or more members was unenforceable under

---

**20.** Under § 365(d)(2), Bankruptcy Code, such executory contracts may be assumed or rejected "at any time before the confirmation of the plan" unless the court, on motion of a party to the contract, sets a specified time for the assumption or rejection. Subsequent to the trial, the DeLu- cas filed a proposed Third Amended Joint Plan of Reorganization that contains general language assuming all their "Partnership Agreements," without specifically delineating what those agreements are. That proposed plan has not yet been confirmed.

§§ 541(c)(1), 363(*l*), and 365(e), Bankruptcy Code. The court agreed that the articles of organization and the operating agreements constituted executory contracts,[21] but held that "[t]he debtor and debtor in possession are the same entity for executory contract purposes in a Chapter 11 reorganization." 188 B.R. at 613. Since the debtor in possession was the same entity as the pre-petition debtor, the bar against assumption of personal service contracts over the objection of an unwilling party simply did not apply. Whatever else may be said of this argument, it is, as noted above, contrary to controlling authority in this district, and this court therefore cannot accept the result reached in *Daugherty Construction.*

■ Since R & M Kiln Creek is not itself in bankruptcy, there is no bankruptcy policy that protects it against the effect of its own dissolution. Giving effect to the operating agreements does not deprive the DeLucas of their economic interest in R & M Kiln Creek or, through it, their economic interest in D & B Venture—that is, their right to receive the distributions due to R & M Kiln Creek under the amended operating agreement. Even though both D & B Venture and R & M Kiln Creek are "dissolved," such dissolution merely commences the process of winding up. Given the nature of D & B Venture's remaining business—the development and sale of commercial real estate—any winding up will necessarily consist of the sale of the remaining parcels and the distribution of the sales proceeds, after expenses of sale and payment of the company's debts, to the members in accordance with the amended operating agreement. Thus, the DeLucas will receive, in connection with a winding up,

essentially what they would have received even had D & B Venture not been dissolved.

C. *Whether JTB has the right to direct the winding up of D & B Venture.*

■ The Virginia Limited Liability Company Act, as it read at the time the DeLucas' chapter 11 petition was filed, provided as follows:

> Unless otherwise provided in the articles of organization or an operating agreement, the members *who have not wrongfully dissolved a limited liability company* may wind up a limited liability company's affairs.

§ 13.1–1048 (emphasis added).[22] JTB relies on this provision as establishing its sole right to control the winding up.

In one sense, the issue of who has the right to direct the winding up of D & B Venture is moot, since a chapter 11 trustee is currently serving and as a practical matter is winding up the company's affairs by selling its remaining real estate. It is also true, however, that a chapter 11 trustee's appointment may be terminated by the court at any time before confirmation. § 1105, Bankruptcy Code. JTB has advised the court that if JTB is determined to have the right to wind up the company's affairs, it will move to terminate the trustee's appointment and may move to dismiss the chapter 11 case. Since the chapter 11 trustee was appointed as a response to creditor complaints concerning the DeLucas' management of the various DeLuca entities, and since the value of the company's real estate may be sufficient to pay all creditors in full outside bankruptcy, JTB may well be entitled to follow-on relief if the issue of control is decided in its favor.

---

21. "Each LLC is an ongoing business. The continuation of business contemplates an ongoing relationship and mutual obligations between each LLC's members. The member relationships are essentially executory in character.... The unperformed obligations of LLC members *inter se* are executory obligations which, if not performed, would constitute a material breach excusing performance by other members. Therefore, I conclude that the LLC Articles and Agreements constitute executory contracts under section 365." 188 B.R. at 612

22. Effective July 1, 1995, the statute was amended to delete the italicized language and now reads as follows:

> Except as otherwise provided in writing in the articles of organization or an operating agreement, upon the dissolution of a limited liability company, the members may wind up the limited liability company's affairs; but the circuit court of the locality in which the registered office of the limited liability company is located, on cause shown, may wind up the limited liability company's affairs on application of any member, his legal representative, or assignee.

Accordingly, the court does not consider the issue moot.

■ The question is whether, as JTB contends, only it has the right to direct the winding up. The operating agreement, although providing for the dissolution of the company upon either member's bankruptcy or dissolution, also provides in ¶ 11.4 that the manager will direct the winding up without addressing what would happen if the manager were the member that had been dissolved. The statute states, *"Unless otherwise provided* in the articles or organization or an operating agreement, the members *who have not wrongfully dissolved* a limited liability company may wind up a limited liability company's affairs." § 13.1–1048. The initial question, then, is whether the amended operating agreement "otherwise provide[s]" for the winding up. Taken literally, it certainly does: it expressly states that "[u]pon *any* dissolution of the Company ... the Manager ... shall liquidate the assets" (emphasis added). The conceptual issue is how the manager can do so if it is no longer capable, because of its own dissolution, of continuing to act as manager. Even granted that R & M Kiln Creek's "dissolution" does not result in the immediate termination of its existence as a legal entity, it does terminate its right to engage in business except to the extent necessary for the orderly winding up of its business affairs. The question, then comes down to this: does R & M Kiln Creek's right to wind up its own affairs include the right to wind up a limited liability company of which it is a member? No authority has been cited to the court either way, and the court's own research has not uncovered any. While in some respects it certainly seems incongruous to permit a dissolved entity to control the winding up of another dissolved entity, when there is an entity (in this case, JTB) that is fully capable of acting, nevertheless that is what the operating agreement says.

Given the policy apparent throughout the Virginia Limited Liability Company Act of giving the members of a limited liability company broad freedom to structure their relationships as they choose, this court is not free to disregard the language of the amended operating agreement simply because its application might seem problematical or odd in particular circumstances. Accordingly, I cannot conclude that, outside bankruptcy, JTB would have the exclusive right to direct the winding up of D & B Venture based solely on the forced dissolution of R & M Kiln Creek.[23]

■ This is not to suggest, were D & B Venture's Chapter 11 case to be dismissed, that JTB would not be entitled to invoke the aid of the appropriate state circuit court under § 13.1–1048, Va.Code Ann., with respect to the winding up, and to ask the state court to appoint it as the receiver for the company. With respect specifically to the proceedings in this court, however, I am of the opinion that at the present time, the best interest of both creditors and equity security holders, is served by having the chapter 11 trustee continue as the representative of the debtor. The chapter 11 trustee has consulted extensively with the DeLucas and with Broyhill and has been active in marketing the remaining unsold parcels. As long as the dispute between Broyhill and the DeLucas remains unresolved, management of D & B Venture by a neutral chapter 11 trustee is clearly preferable to vesting management authority in either of the two warring members.

**23.** Since I find that the language of the amended operating agreement controls, I do not reach the semantic issue of whether R & M Kiln Creek "wrongfully" dissolved D & B Venture, thereby precluding it from participating in the winding up. R & M Kiln Creek argues that "wrongfully," in its ordinary sense, connotes some level of impropriety or wrongdoing, and that a member can be barred from participating in the winding up of a limited liability company only if the member's inequitable or unjust conduct forced the company's dissolution. JTB argues that "wrongfully" should not be read so expansively as to require a finding of misconduct, and that in context the clear meaning is simply that the member whose conduct or status triggered dissolution is not entitled to participate in the winding up. While the issue is not free from doubt, I would be inclined to agree with JTB on this point if I had to make a choice. Since the General Assembly, in its 1995 amendments to § 13.1–1048, dropped the language in question, and the statute now simply provides that "the members" may wind up the company's affairs, future courts will not have to struggle with this particular issue of statutory construction.

For the foregoing reasons, which constitute the court's findings of fact and conclusions of law under Fed.R.Bankr.P. 7052, a separate order will be entered determining (1) that the action of April 28, 1995, was not effective to remove R & M Kiln Creek as the manager of D & B Venture and to elect JTB as the new manager; (2) that R & M Kiln Creek has been dissolved as a result of the chapter 11 filing by the DeLucas; and (3) that JTB is not entitled to sole control over the winding up of D & B Venture.